1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF MARYLAND

3

4       RONALD W. HAY, ET AL.

5                   PLAINTIFFS

6            VS.                      CIVIL NO. CCB-08-2662

7       CONSTELLATION ENERGY          ERISA LITIGATION
        GROUP, INC., ET AL.
8
                            DEFENDANTS
9
                                     Baltimore, Maryland
10                                   June 17, 2010

11

12           The above-entitled case came on for a motions

13      hearing before the Honorable Catherine C. Blake,

14      United States District Judge

15

16                   A P P E A R A N C E S

17

18      For the Plaintiffs:

19           James A. Bloom, Esquire
             Ron Kilgard, Esquire
             Matthew M. Guiney, Esquire
20           Julie Siebert-Johnson, Esquire

21

22      For Constellation Energy Group, Inc., et al.

23           James P. Gillespie, Esquire
             Karen McCartan DeSantis, Esquire

24

25      Gail A. Simpkins, RPR
        Official Court Reporter

1    For the Individual Defendants:

2        James D. Mathias, Esquire
         Ian C. Taylor, Esquire

1                    P R O C E E D I N G S

2          THE COURT:  I see some of you again.  Please be

3     seated.

4          THE CLERK:  The case pending before this Court

5     is Civil Action Number CCB-08-cv-2662, Ronald Hays

6     versus Constellation Energy Group, Inc., et al.  This

7     matter is set in for a motions to dismiss hearing.

8          THE COURT:  All right.  Good afternoon, Mr.

9     Mathias.

10         MR. MATHIAS:  Good afternoon, Your Honor.

11         THE COURT:  I will just tell you a couple of

12    things that I am looking for help on from both sides

13    as we go through, which you probably were going to do.

14    There's a question of who exactly are the fiduciaries,

15    where do we have an agreement, and where do we not?

16         I would like some focus on the actual specific

17    controlling language of the plans, which is obviously

18    critical and seems to be somewhat different between

19    Constellation and Nine Mile, counsel, a little bit of

20    discussion, and this may be more on the plaintiffs'

21    side, understanding that you think that at some point

22    it was not prudent to continue contributions to the

23    company stock fund, when, and I guess for both, does

24    it make a difference whether we are talking about

25    continuing to offer the stock fund as an option for

1    participants versus continuing to contribute the

2    matching amount to, the employer matching amount to a

3    stock fund?  Is there any difference in the

4    obligations?  Does the language of the Plan make any

5    difference in how the fiduciaries, whoever they were,

6    should have looked at those options?

7          And I am also happy to hear whatever it is you

8    were going to say anyway.

9          MR. MATHIAS:  Thank you, Your Honor, Jim Mathias

10   for the individual defendants.  I'm going to address

11   Count I, prudence and loyalty.

12         THE COURT:  Okay.

13         MR. MATHIAS:  Mr. Gillespie, who represents

14   Constellation and Nine Mile, will address the other

15   counts and perhaps some specific matters to the

16   company.

17         THE COURT:  Okay.

18         MR. MATHIAS:  I would like to start with just a

19   brief overview and then go back in some detail and

20   address some of the questions Your Honor has.

21         Both in the securities case you heard this

22   morning and the ERISA case this afternoon, we

23   basically have the same core facts and factual

24   theories, and all of this takes place within the

25   framework of a worldwide credit market meltdown, where

1    stocks dropped for a number of companies for a number

2    of reasons.

3        The ERISA prudence laws in the stock-drop

4    context are not designed to deal with all bad news or

5    every stock drop or every adverse development.

6    Instead, they are designed to deal only with

7    extraordinary circumstances that create a duty for a

8    fiduciary in this context to disobey a Plan that says

9    the company stock will be offered, and to order a

10   complete divesting of company stock from the Plan,

11   because there's no duty of diversification.

12       So if there's an argument in this context with

13   an ESOP that the fiduciary had a duty to step in and

14   act, it's a duty to divest entirely at a particular

15   point in time of all company stock.

16       So that's both a unilateral and somewhat

17   extraordinary, if not radical, alteration of the Plan

18   participants' portfolios, and of their choice, and

19   that's an important point that I will come back to,

20   that in this instance, the Plan participants, at any

21   point in time they have complete discretion to decide

22   what offerings in the portfolio they want to invest

23   in, and they can change it at anytime.

24       So in keeping with the extraordinary nature of

25   this kind of action being asked of a fiduciary or

1      being put on a fiduciary as a duty, the plaintiffs

2      need to show not just the price drop, but some kind of

3      precipitous decline, an extraordinary decline in the

4      stock price.  And more than that, they need to show

5      that the fiduciaries had some knowledge or should have

6      known in advance that the stock price was going to

7      continue to decline in the future, such that they had

8      an obligation to step in and act.

9           Furthermore, in most cases the plaintiffs need

10      to show some knowledge of not just a decline, but of

11      an imminent collapse in the company, in the company's

12      stock price, and at the very least, need to show that

13      they are dealing with some dire situation.

14           I think it has been described in a number of the

15      cases as, if you get to the Moench presumption, that

16      is a substantial shield that protects the fiduciary

17      from having to act, and the point is you don't react

18      to every possible stock drop.

19           With regard to that, in terms of showing

20      extraordinary circumstances that take this out of the

21      case of what most companies were dealing with, which

22      were just on a day-to-day basis, everyone trying to

23      decide what's going on with the credit market, what's

24      going on with the overall economy, what's going to

25      happen tomorrow, what's going to happen the day after

1      tomorrow, the plaintiffs have pointed to three buckets

2      of factual allegations which will be familiar to you

3      from the securities case.

4          THE COURT:  Let me back up for one second before

5      that.

6          MR. MATHIAS:  Sure.

7          THE COURT:  You said that what you think they

8      are suggesting is that there would have been a duty to

9      not just take away the availability of the company

10     stock fund as an option for participant contributions,

11     not make any further investments in company stock

12     funds, you're interpreting what they are requesting,

13     the obligation that they would impose would be a

14     complete divestiture, sell off all the company stock.

15         MR. MATHIAS:  Well, I believe that's the legal

16     test here.  There's no duty to diversify in an ESOP.

17     So if you decide that the company stock is an

18     imprudent investment, you've decided that one share is

19     too many.  I think that's an important point, because

20     I think it speaks to the legal principles that the

21     Court should apply in this case.

22         The factual background, the buckets of

23     allegations, and I'll come back to these and discuss

24     them in more detail later, but the three things that

25     the plaintiffs in their Amended Complaint and in the

1     motions papers focus on is simply that Constellation

2     had a risky business model and was mismanaging the

3     company, and should have known that they had a risky

4     business model that was going to lead to the company

5     stock becoming an imprudent investment.

6          They also point to the collateral downgrade

7     estimate calculation error, and they point to the

8     Lehman situation in September of 2008 and its effect

9     on Constellation.

10         We believe the facts here show, and if you look

11    at the allegations, that at all times Constellation's

12    future stock performance remained unpredictable,

13    unknowable, and that the company was reacting just

14    like everybody else to an unfolding situation, and

15    that the plaintiffs have got to allege something that

16    suggests that the fiduciaries knew something different

17    and knew what was going to happen and, therefore,

18    should have acted, because there is no obligation for

19    the fiduciaries to outsmart the market.

20         So here, ultimately the facts will matter, the

21    knowledge or the should have known of the fiduciaries

22    will matter, and I'm going to spend more time on this

23    later, the timing of when things occurred and how they

24    occurred really does matter here, because there is a

25    difference between knowing something in advance on the

1    one hand, and reacting to a situation on the other

2    hand.  We think that the facts as alleged here from an

3    ERISA standpoint actually are quite unremarkable.

4         So with that as a prelude, I want to turn to the

5    Plans.  The Plans, both the Constellation Plan and the

6    Nine Mile Plan, here were EIAP's, Eligible Individual

7    Account Plans, and the Constellation Common Stock

8    Fund, which was offered in both Plans, is an ESOP, the

9    purpose of which is to encourage employee ownership in

10   Constellation's stock.

11        The Plans consisted of voluntary contributions

12   by the participants and the company-matching

13   contributions.

14        The company match, at all times and in all

15   cases, here was always in the Constellation Common

16   Stock Fund in both Plans, and that's specified in the

17   Plans and the SPD's for the Plans, that the company

18   match shall be initially invested, or will be

19   automatically invested in the company stock.

20        Now an important point is immediately, if the

21   participant does not want to have company stock, they

22   may move it into one of the other 20, I believe it was

23   23 different offerings in the overall Plans.  So there

24   was a Constellation Common Stock Fund, an Interest

25   Income Fund, and then about 20 mutual funds, and 24

1    hours a day, seven days a week, there were ways for

2    Plan participants to give the Plan notice that they

3    wanted to change their portfolio.

4         The Plans themselves do not in any way expressly

5    grant the fiduciaries any discretion to remove

6    Constellation stock as an option in the Plan.  I think

7    that's an important point here.

8         Essentially, you would have had to rewrite the

9    Plan with regard to matching contributions and other

10    things if Constellation stock were to be removed from

11    the Plan, and that is a settlor function.

12         You will notice in the papers frequently the

13    plaintiffs, in the motions papers, refer to

14    Constellation generically and don't designate whether

15    they are talking about them as a fiduciary or whether

16    they are talking about them as the settlor of the

17    Plan, but that's an important distinction, because in

18    a Plan like this, it's the settlor who decides what

19    goes into the plan.

20         THE COURT:  Right.

21        MR. MATHIAS:  The only argument that the

22    plaintiffs have raised is the argument having to do

23    with the use of the word or, which suggests to them

24    that the fiduciary somehow had discretion to remove

25    Constellation stock from the Plan.  But if Your Honor

1    goes back and looks at what the Plan says, it's

2    talking about investments and it says the money can be

3    invested in the Constellation Stock Fund, the Interest

4    Income Fund, or the Plan, the offerings picked by the

5    fiduciaries.  So you have three things.

6        THE COURT:  Well, it says any other -- I mean

7    I'm looking at page 16 of the Plan, Section 5.1(a).

8    That is the Constellation Plan now that I'm looking

9    at.

10        MR. MATHIAS:  Right.

11        THE COURT:  It's one or more of the following

12   investment funds, and it's the CEG Common Stock Fund,

13   the Interest Income Fund, or any other investment fund

14   selected by the Investment Committee from time to

15   time.

16        MR. MATHIAS:  So that the Plan designates.  You

17   have the Constellation Common Stock Fund.  You have

18   the Interest Income Fund, and then you have other

19   investment funds selected by the Investment Committee.

20        Then in the definitions section, it actually

21   defines those terms of investment funds and other

22   investment funds, investment funds to include

23   Constellation stock.  Other investment funds does not.

24   That is at Appendix A.

25        THE COURT:  Okay.  The definitions.  Why does

1     that not give the fiduciary the discretion to leave

2     out the Common Stock Fund, to say well, we're going to

3     go with some of these other investment funds?

4           MR. MATHIAS:  First of all, it's an ESOP that

5     says matching contributions are automatically, or

6     shall be invested in the company stock.

7           THE COURT:  I understand that.

8           MR. MATHIAS:  It presupposes that the company

9     stock is going to be involved.

10          THE COURT:  Right.

11          MR. MATHIAS:  The disjunctive of or means that

12    there are going to be three offerings.  There's going

13    to be the Constellation stock.  There's going to the

14    Interest Income Fund, and then there's going to be any

15    other investment funds that are selected by the

16    Committee.

17          That doesn't suggest that the Investment

18    Committee has any discretion from the settlor to

19    influence one or two.

20          THE COURT:  Well, but then how do you interpret

21    it when it says contributions for the Plan will be

22    invested in one or more of the following?

23          MR. MATHIAS:  Because contributions to the Plan

24    will be -- first of all, it says invested.

25          Remember, this is the Plan that controls what

1    Plan participants can do.  Plan participants put in

2    their own money, and they can put it into anything

3    they want to.

4          THE COURT:  Right.

5          MR. MATHIAS:  So they don't need to invest in

6    Constellation Common Stock.

7          THE COURT:  Right.

8          MR. MATHIAS:  They can invest in any one of

9    those three.  But what we are talking about here is

10   what the settlors have determined should be offered.

11   If the fiduciary stepped in and took away the CEG

12   Common Stock Fund, then that statement would no longer

13   be true.

14         The way the settlor set it up, a Plan

15   participant would not be able to invest in it.  So you

16   would be changing the character of the fund and you

17   would be changing the options available for people to

18   invest.

19         THE COURT:  Okay.

20         MR. MATHIAS:  Again, I think I made this point,

21   but it's talking about how the money would be

22   invested, not what the selections are that are

23   available.

24         So with that, let's turn to the --

25         And with regard to your question about the

1       fiduciaries, there was a question about whether anyone

2       was acting as a fiduciary here, and I'm going to get

3       to that in just a second.  But to the extent a

4       fiduciary, that a duty arose for a fiduciary to act,

5       we believe it would be limited to the Investment

6       Committee members and the Plan Administrator, Ms.

7       Behlert, not to Constellation.

8             THE COURT:  The Investment Committee and Ms.

9       Behlert?

10            MR. MATHIAS:  Right.

11            Now the threshold issue, Your Honor, is that a

12      fiduciary cannot be liable for breaches of duty of

13      prudence if they are not acting as a fiduciary.

14            In this case, as we just talked about,

15      Constellation stock is to be offered.  That's the

16      rule.  That's consistent with section 404(a)(1)(D) of

17      ERISA which says a fiduciary is required the follow

18      the Plan so long as it is consistent with the rest of

19      ERISA.

20            So where a duty might arise in certain

21      circumstances would be a narrow exception where the

22      situation is so extraordinary that even though the

23      Plan says stock will be offered, the fiduciary makes a

24      decision that it would not be prudent and, therefore,

25      is not consistent with ERISA.

1          So our position, just so it's clear, is there's

2     no fiduciary power to take Constellation stock out of

3     the Plan unless you get to that circumstance, that

4     extraordinary circumstance.  Again, as we mentioned

5     earlier, that's consistent also with the absence of

6     any duty to diversify.

7          So that's the threshold question.  The cases

8     usually focus on that.

9          The next thing you get to is you say are we

10    going to recognize a Moench presumption, what has been

11    called the Moench presumption?

12         Your Honor, I think that the Moench presumption

13    really does flow out of that idea that there is not a

14    fiduciary power to act unless an extraordinary

15    circumstance exist.

16         In that regard, it really isn't an evidentiary

17    presumption or an affirmative defense.  The courts

18    have said, and the trend in the law is that where you

19    have this situation, the plaintiffs have to plead some

20    facts that suggest that this extraordinary

21    circumstance exist so that a duty in fact has arisen

22    where it otherwise wouldn't under the Plan.

23         So we believe the Moench presumption both

24    applies here and applies at the motion to dismiss

25    stage, which the Third, Fifth, Seventh and Ninth

1    Circuits all have found, and certainly many trial

2    courts over the last several years have adopted that.

3         Now in terms of what you would do other than the

4    Moench presumption, the only thing the plaintiffs have

5    pointed to is the DiFelice standard.

6         I would just say the DiFelice case, if you look

7    at it, was a completely different circumstance, where

8    the company was the fiduciary.  The company had, as

9    the fiduciary, had complete discretion on what to do

10   if terms of what the options were with regard to

11   company stock, and in fact, there were things in the

12   Plan that discouraged the use of company stock.

13        THE COURT:  Right.

14        MR. MATHIAS:  So the Moench presumption really

15   ought to apply here.

16        The other reason, or the other thing to point

17   out at this point about the Moench presumption is it

18   reflects the reality that if you hold the fiduciary to

19   too wide a standard or too quick a standard in terms

20   of when a fiduciary has to step in and divest of

21   company stock -- in other words, if you were to

22   suggest that any time there's a drop in the stock

23   price, they would have to do something -- you really

24   create a terrible Catch-22 for the fiduciary because

25   if they divest of the stock, and then the next day or

1    the next week the stock rises, and they have taken

2    everybody out, they're going to get sued for that.

3         So they're on the horns of a dilemma, and that's

4    why it should only be, it should only be exercised in

5    the most extraordinary circumstances.

6         So that gets us to whether in this case they

7    have alleged facts that would overcome the Moench

8    presumption or to suggest that there is any abuse of

9    discretion by the fiduciary.

10        THE COURT:  Do you think it makes a difference

11   in the applicability of the Moench presumption or

12   anything else that there's a difference in language

13   between the Constellation Plan and the Nine Mile Plan?

14        MR. MATHIAS:  I don't, Your Honor, because,

15   first of all, I think the cases now indicate that if

16   the Plan in any way -- some cases have gone so far as

17   to say if the Plan permits the use, or the offering of

18   company stock.

19        But if the Plans presuppose, for instance, the

20   use of company stock where it's an ESOP and there's

21   some limitation on the discretion to take company

22   stock out, and they're clearly trying to encourage

23   employee ownership of company stock, that the Moench

24   presumption ought to apply.

25        While the language is slightly different in the

1    two Plans, when you look at the NMP Plan and the SPD

2    that describes it, it's pretty clear that it

3    presupposes at the very least that company stock will

4    be offered.  The language in the SPD is that it will

5    automatically, all matching contributions will be

6    invested in company stock.  So I don't think it makes

7    a difference.

8         With regard to overcoming the Moench

9    presumption, I now want to go back to the factual

10   allegations, and the first one is this notion of

11   mismanagement or some kind of improper or imprudent

12   business strategy.  It's repeated several times in the

13   Amended Complaint, but it's listed as a list of five

14   or six items in paragraph seven and several other

15   paragraphs in the Amended Complaint.  We also

16   mentioned it, repeated it in our motion to dismiss at

17   page five.

18        But essentially the theory is that

19   Constellation's fiduciaries knew or should have known

20   during 2008 that Constellation stock was going to

21   become an unduly risky and imprudent investment, and

22   they knew that in advance.

23        This is the exact same business model, Your

24   Honor, that Constellation had been following since

25   2001.  While it certainly involved significant risks,

1     those risks were disclosed and those risks had

2     generated significant rewards for shareholders.

3         So the mere fact that a company has a business

4     model that is disclosed, and has been successful in

5     and of itself cannot be the basis for a prudence claim

6     unless the plaintiffs can show some fact that should

7     have led the fiduciaries to be able to predict the

8     future, and to know what was going to happen in the

9     future with the Plan and with the company stock, and

10    they haven't articulated anything of that nature.

11        With regard to the collateral downgrade estimate

12    calculation error, which is the second thing that they

13    point to, there's no allegation that the fiduciaries

14    had any idea in advance that that error existed.  It

15    was simply a mistake that was found and corrected.  It

16    was an automated process where they discovered it,

17    they disclosed it, and the stock dropped when they

18    announced it.  Then the stock immediately began to

19    climb back up.

20        So as a fiduciary looking at this situation,

21    you've got a mistake.  The stock is still trading at

22    $83 a share.  There's no indication that that reflects

23    some -- excuse me, $83 a share before the mistake, and

24    then it dropped.

25        There's no indication that this goes to the

1    fundamental soundness of the business or the business

2    plan.  It's simply a mistake that was reacted to.  The

3    company shortly thereafter announced that it had

4    secured $2 billion in additional liquidity to be

5    closed on in October.

6         So a fiduciary even looking at that situation

7    would see that the company had stabilized and

8    certainly does not lead to the kind of extraordinary

9    circumstance where it would no longer be prudent to

10   have an investment in the company.

11        THE COURT:  Did the stock start to go back up

12   again?

13        MR. MATHIAS:  The stock dropped the first day,

14   maybe the first couple days.  Then by -- I think it

15   went from 73 down, about $10.  Then by August 28th, it

16   was back up to 68.

17        Now the third thing is the Lehman bankruptcy and

18   its effect on Constellation.  I want to talk about

19   that in some detail, but I just want to start with

20   where the Class Period for this case is supposed to

21   start according to the plaintiffs, and go through the

22   time line, and we'll finish up with Lehman.

23        According to the plaintiffs, if taken literally,

24   as of January 30th of 2008, the fiduciaries had an

25   obligation to disobey the Plan and get every share out

1    of the company stock, and we submit that that's simply

2    ridiculous.

3        The stock was traded at $92 a share.  It was

4    near all time highs, and absent someone's ability to

5    predict a credit meltdown nine months later, that

6    makes no sense at all.

7        Fast forward to the end of July of 2008, the

8    stock is still trading at $83.  So the stock has gone

9    up and down over the period of seven months.  It is

10   now at $83.  It has gone down about $9 from where it

11   was January, certainly not a precipitous drop.

12       There's certainly no allegation that at that

13   point in time any fiduciary should have known what was

14   going to happen in the future or that there was any

15   indication.  I mean at that point they didn't know

16   whether the stock would go up the next day or go down,

17   so again, not a situation where the duty to disobey

18   the Plan would come into any effect.

19       I talked earlier about the August 11th period.

20   You simply have an honest mistake.  It was made.  It

21   was disclosed.  The stock price stabilized.  It

22   started to increase, and the company announced

23   additional liquidity.

24       So again, you've got the stock price trending

25   down along with the market as the market jitters were

1    increasing, but still a strong company, nothing to

2    suggest, unless somebody could predict the credit

3    meltdown, that the company wasn't going to be in good

4    shape going forward.

5        So then you get to September 15th.  As of

6    September 12th, the company stock had again trended

7    down slightly with the market, and on September 15th,

8    the market opens knowing that Lehman has gone into

9    bankruptcy.

10        There is no allegation that a fiduciary at

11    Constellation, number one, should have known that

12    Lehman was going to go into bankruptcy, number two,

13    known that the government was not going to bail out

14    Lehman in the way it had bailed out Bear Stearns, and

15    number three, been able to predict in the future,

16    predict the future that that would have a direct

17    impact on Constellation.  Let me focus on those things

18    a little more.

19        The stock closed on Friday, September 12th at

20    $58.38.  On September 15th, the Monday, it closed at

21    $47.99.  Now this is before Constellation had issued

22    its 8-K, explaining anything about its relationship

23    with Lehman.

24        So the market is trending downward for a lot of

25    companies in the credit market because there's this

1    uncertainty about what's going on in the market.  But

2    again, a fiduciary in that situation now doesn't have

3    preexisting knowledge or foresight.  They're in the

4    situation of reacting to the market in the same way

5    everyone else is, and I don't believe there's a single

6    case, ERISA case under the duty of prudence that

7    suggests that a fiduciary would have an obligation to

8    predict the future or to step in in a fast-evolving

9    situation like that and decide how that situation is

10   going to be resolved.

11       On September 16th, AIG gets downgraded by the

12   rating agencies.  The market continues in general to

13   spiral downward.  Constellation ends that day at

14   $30.76 a share.

15       Now this is the one place where I would say you

16   see the stock now declining at a significant rate,

17   where that wasn't the case on any of these earlier

18   dates.  But there are two problems with the

19   plaintiffs' theory in trying to allege a breach of

20   prudence at that point.

21       First of all, I talked about the lack of

22   advanced knowledge that that was going to happen, and

23   the second thing is what's going to happen the next

24   day or the day after that?  Is the stock going to

25   continue to go down?

1          In truth, what happened, and a fiduciary looking

2     at this situation, the company, within the time frame

3     of that one week, had two offers to stabilize the

4     company and move forward.  So they couldn't have been

5     expected to predict the Lehman situation or the

6     complete freezing up of the credit market.

7          Then they look at the situation.  If you're even

8     inclined to consider what they were looking at, we

9     know from the facts that the company was almost

10    immediately stabilized, and the stock began to move

11    up.

12         So the one situation, and this gets back to the

13    Catch-22, the one thing that the plaintiffs might say

14    is well, the stock continued to drop, and the stock

15    got all the way down to $13 a share one day during

16    that week.

17         But think about that, Your Honor.  If that had

18    happened and the fiduciaries had stepped in, even

19    though they knew that the company was working on these

20    offers that they had and was going to be able to

21    announce something that week, if the fiduciaries had

22    stepped in and divested of the company stock at that

23    point, that actually would have been the worst time to

24    divest of the company stock because we know that it

25    went back up, and went back up to $32 within that

1    month of September.  I'm sorry, not 32.  It went up to

2    26 I believe, and a year later had gone up to 32.

3        So in fact, the proper and the appropriate thing

4    to do in that situation was -- it was a fast-evolving

5    situation.  You have no advanced knowledge.  You see

6    the situation.  The company is stabilizing.  The stock

7    is going to come back.  You don't do anything.

8        If you compare that situation to all the cases

9    where the Moench presumption has been overcome,

10   there's always some advanced knowledge of something.

11   It's usually some kind of illegal activity or

12   accounting fraud or something that's known within the

13   company that the fiduciaries know, that they can say

14   with some degree of reliability is going to cause this

15   company stock to tank and the company is really going

16   to be in trouble.  They know it in advance and they do

17   nothing.

18       That's why I said the timing is so important

19   here.  You never have that point in time in this case

20   where the fiduciary had information that the market

21   didn't have and knew what was going to happen on the

22   next day with the stock, or had a pretty good idea of

23   what was going to happen with the stock.

24       Instead, you have a case where, and we all lived

25   through this, looking at the market every day, every

1        day they looked at it and had to guess is this the

2        bottom, is it over, is it going back up tomorrow, are

3        there going to be other problems?

4            But they didn't have any inside knowledge.

5        There was nothing they should have known that told

6        them it would continue to go down.  To the contrary,

7        as I pointed out, to the extent they had knowledge at

8        all, they knew that the company had plans to

9        stabilize, and by the middle of that week had

10       announced it.

11           THE COURT:  Short of going ahead and selling

12       off, what do you think should lead a fiduciary that's

13       in this sort of possible double loyalty situation to

14       get some outside advice, ask someone else outside of

15       the company whether there's any problem with

16       continuing to maintain this investment?

17           MR. MATHIAS:  The short answer is no, because in

18       this situation they don't have a duty.  They don't

19       have the discretion to act.  The settlor has set the

20       Plan, and it is the settlor's function, and the duty

21       only arises if you have this extraordinary

22       circumstance because again, we're not talking about a

23       fiduciary.  I think there's an important distinction

24       here.

25           In the DiFelice case, you had a fiduciary that

1      had discretion, everybody understands that, had

2      discretion that they could either offer the company

3      stock or not offer the company stock.  But in a

4      situation where the fiduciary does not have that

5      discretion, there would be no reason for that.

6           Whether they've got that or not, they certainly

7      didn't have a duty to get that kind of outside advice,

8      because that's the whole purpose of the Moench

9      presumption, recognizing that the fiduciary does not

10     have that discretion.  The Moench presumption only is

11     overcome if those extraordinary circumstances arise.

12     Until that happens, or unless that happens, the courts

13     don't look at all at what in fact the fiduciaries did

14     in the way of investigation.

15          THE COURT:  Well, I'm looking at Moench.  I

16     guess I didn't interpret it quite that same way.  I

17     mean there would have to be --

18          Because the duty is somewhere between being

19     permitted and being required, I think the Moench court

20     said well, we're going to give them this presumption

21     of prudence.  But they also looked at how the

22     Committee had interpreted the Plan documents, which

23     were fairly similar, if not even stronger in Moench,

24     that were supposed to be invested statewide in the

25     company stock and they said well, that's too strict a

1    reading.

2         I mean even in Moench they said no, you've got

3    to admit that there is some discretion under

4    extraordinary circumstances to go ahead and divest, or

5    go ahead and look for a different vehicle.

6         I thought they discussed at some point also, I

7    think one of the factors to look at if you get to that

8    point and you're going into discovery is well, did

9    they go to anybody else?  Did they go to any outside

10   advisor, outside legal counsel, anyone, and say look,

11   we are really in a difficult position here, what do

12   you think?  Is this a good investment to continue to

13   maintain?

14        MR. MATHIAS:  Your Honor, the Moench case, if I

15   recall correctly, was essentially looking at the case

16   post trial, or certainly at a later stage.

17        THE COURT:  Yes.  There had been a summary

18   judgment.

19        MR. MATHIAS:  Right.

20        THE COURT:  And it reversed the summary judgment

21   actually.  The District Court had granted summary

22   judgment and the Fourth Circuit --

23        MR. MATHIAS:  The court was looking at a

24   developed record, and if I recall correctly, the court

25   went through its analysis and went through the various

1        stages of was there, was there a fiduciary duty, and

2        then talked about the Moench presumption.  And it's

3        only if you overcome the Moench presumption that you

4        then get into an investigation of what was done by the

5        fiduciaries in the way of an analysis of the

6        investigation that was done.

7            At this point, unless those extraordinary

8        circumstances exist to create that duty to do

9        something, it's at that point that the Court would

10       look at okay, what did the fiduciary do in that

11       circumstance?

12           So the duty to investigate does not arise when

13       you're at this stage and the allegations have not

14       sufficiently been pled.

15           I think one case to look at in that regard which

16       is factually similar is the Kirschbaum case from the

17       Fifth Circuit.

18           THE COURT:  I looked at Kirschbaum.  Don't you

19       think Kirschbaum was a little -- goes a little further

20       than the Fourth Circuit would?

21           MR. MATHIAS:  I don't know.  I think the

22       Kirschbaum case is pretty consistent with the cases

23       that have been coming out of the other circuits and

24       out of the Southern District of New York.

25           Well, just briefly, then I want to jump to the

1    duty of loyalty, unless you had any other questions.

2          THE COURT:  No.  That's fine.  Go ahead.

3          MR. MATHIAS:  On the duty of loyalty claim here,

4    which is also part of Count I, it really is a claim

5    that the fiduciaries had made misrepresentations,

6    hadn't disclosed information about what was going to

7    happen to the company stock going forward, and there

8    are really only two points I want to make.

9          The first is that I don't think they have

10   alleged any materially misleading or inaccurate

11   statements in the SEC filings, other than to say the

12   company was overexposed and risky.  Those kind of

13   generalities, for all the reasons I talked about

14   before, really aren't sufficient.  So they haven't

15   identified a material misrepresentation, which they

16   need to.

17         But more sort of fundamentally, and I think the

18   case law is certainly trending this way, the SEC

19   filings of the company, that is a corporate function.

20   It is not an ERISA function or a fiduciary function.

21         In the Fourth Circuit, an ERISA fiduciary is

22   responsible only for disclosures about Plan benefits,

23   not disclosures about Plan investments.  Maybe it

24   should or shouldn't matter, but some of the courts

25   look into sort of what's incorporated into what, and

1    we spell that out in our papers, even though that may

2    be elevating form over substance, and the basic point

3    ought to simply be that ERISA fiduciaries don't make

4    SEC disclosures.

5         In this case, it's the securities laws that

6    require the Plan sponsor to issue a prospectus.  They

7    then incorporate the other SEC filings, the quarterly

8    filings and the annual filings into the prospectus.

9         Then here, the SPD, the Summary Plan Description

10   was also incorporated into the prospectus.  So it

11   wasn't the other way around, that the Summary Plan

12   Description incorporated those other documents into

13   it, and there's nothing in the Summary Plan

14   Description that encourages people to, in considering

15   their Plan benefits, go read the SEC filings or

16   anything like that.

17        So for those two reasons, we think the duty of

18   loyalty claim has no merit.  That's all I have for

19   now, Your Honor.

20        THE COURT:  All right.  Thank you.

21        MR. GILLESPIE:  Your Honor, would you like to

22   hear from all of the defendants first or would you

23   like to alternate?

24        THE COURT:  Well, why don't I ask plaintiffs'

25   counsel.

1          MR. BLOOM:  No, no, no.  By all means.

2          THE COURT:  Go ahead.

3          MR. GILLESPIE:  Thank you, Your Honor.  I just

4     assumed we were following the protocol from this

5     morning.

6          On behalf of Constellation and Nine Mile, Your

7     Honor, I'm going to address as previewed the second

8     through fifth counts of the Complaint.

9          Plaintiffs plead in these counts that

10    Constellation, Nine Mile, and various individual

11    defendants breached fiduciary duties under ERISA.

12    They allege in Count II that there was failure of a

13    duty to monitor the fiduciaries.  Count III is a

14    conflict of interest claim.  Count IV, there's a

15    co-fiduciary breach liability claim.  Then Count V,

16    there's a claim that even if Constellation wasn't a

17    fiduciary, they have some liability for participating

18    as a non-fiduciary, which they breached.

19         The overarching point I make here, Your Honor,

20    is that each of these claims fails because it's

21    derivative; that is, each claim depends on

22    establishing an underlying breach of ERISA fiduciary

23    duties.

24         Plaintiffs candidly acknowledge on page 37 of

25    their opposition that if they fail to allege what they

1    call primary breach of fiduciary duty, their

2    derivative climbs are doomed as well.

3         As Mr. Mathias has reviewed, plaintiffs have

4    failed to establish a primary ERISA violation.  So

5    that's, quite frankly, the end of the matter for Count

6    V.

7         But as we briefed, each of these counts also

8    have independent deficiencies.  I'm not got to review

9    each of them.  They're in the papers, and I would like

10   to focus the Court more on the primary claims.

11        I will discuss, however, briefly the conflict of

12   interest claim, and turning to that, I would like to

13   say that that claim failed because the Complaint

14   doesn't say how any purported conflict caused any

15   defendant to take an action that was detrimental to

16   the plaintiffs.

17        In DiFelice, the Fourth Circuit made clear that

18   mere status as an officer or director of a company,

19   even if you have an understandable interest in the

20   stock performance, that's not enough to create a

21   conflict.

22        That's basically all that we have here pled.

23   When we raised this argument in our opening brief, the

24   opposition didn't direct us to anything more than,

25   other than the bare corporate capacity allegations in

1     the Complaint.

2          One other point, Your Honor, I would note,

3     following up on Mr. Mathias's points, is that there

4     was, as Mr. Mathias noted, for example, at paragraph

5     seven, in the plaintiffs' laundry list of complaints

6     about why there wasn't prudence, a principal

7     allegation that they have is in subpart (d) in

8     paragraph seven on page three.  It's that

9     Constellation somehow, it says, exposed itself to the

10    credit problems of Lehman Brother.

11         For the reasons we have addressed at length this

12    morning, that allegation just simply doesn't bear up

13    to what the facts were, and our colleagues in their

14    briefing were no more able to identify any specific

15    disclosure to Lehman than the securities colleagues

16    this morning.

17         With that, Your Honor, unless you have any

18    questions I have completed my presentation.

19         THE COURT:  Thank you.  Anyone else?  No.  Okay.

20         MR. BLOOM:  Good afternoon, Your Honor.  My name

21    is James Bloom from Keller Rohrback.

22         THE COURT:  You're going to have to yell or move

23    that mike.  You're taller than the mike.

24         MR. BLOOM:  As I said, I'm James Bloom from

25    Keller Rohrback on behalf of the ERISA plaintiffs.

1          I wanted to quickly clear up one thing that

2     defense counsel was just mentioning about the claim

3     for a breach of the duty to avoid conflict of

4     interest.  That's a duty that the Fourth Circuit

5     recognized in the DiFelice case; although in DiFelice

6     they said that mere status alone is insufficient.

7     There are factual allegations in the complaint that

8     are consistent with the allegations that DiFelice said

9     were lacking in that case.

10          For example, allegations that high-ranking

11     company officials sold stock, you can find that claim

12     in paragraph 215 of the Amended Complaint.

13          Paragraph 216 alleges that the defendants chose

14     to remain silent because of how selling the shares

15     might reflect on the directors and the company.

16          So those are two of the types of things that the

17     DiFelice court was looking for to substantiate the

18     duty to avoid conflicts of interest.

19          THE COURT:  I'm not sure how 216 adds anything

20     more to the argument.  I mean it makes the argument I

21     guess as is inherent any time in their status as

22     corporate officers, but I guess I'm not --

23          MR. BLOOM:  That's correct, Your Honor.  The

24     allegation is not as strong as the allegation that the

25     DiFelice court said would satisfy that duty; but

1    again, these are, you know, allegations made in a

2    complaint pre-discovery.  DiFelice, I believe there

3    was a bench trial of some length.

4         THE COURT:  Right, right.  215, the sale of

5    stock, I think, if I'm remembering correctly from the

6    other complaint, that sale by Mr. Shattuck was back in

7    early February of 2008?

8         MR. BLOOM:  That's right, very near the time

9    that the stock was at its highest price during the

10   Class Period.

11        THE COURT:  Okay.

12        MR. BLOOM:  But looking now at our responsive

13   document, I don't see those paragraphs cited there.

14        THE COURT:  Thank you.

15        MR. BLOOM:  I put up on the screen here, this is

16   the Trust Agreement between T. Rowe Price and

17   Constellation Energy.

18        THE COURT:  Yes.

19        MR. BLOOM:  This is, of course, one of those

20   ERISA Plan documents that is required by the statute.

21   You have to have a trust pursuant to a written

22   instrument.

23        If you'll notice the last sentence of the first

24   paragraph on this agreement --

25        THE COURT:  Just so I can find this here, let's

1   see, you're on page 31.

2       MR. BLOOM:  That's right.  That has been filed

3   as Exhibit 2, or Exhibit 1 to the Derek Loeser

4   declaration in support of the response.

5       THE COURT:  Right.  This particular page is

6   actually in the Second Amendment to the Trust

7   Agreement.

8       MR. BLOOM:  This particular page, that's

9   correct.

10      THE COURT:  Okay.

11      MR. BLOOM:  So if you see where the little hand

12  cursor is on the screen there next to the word the --

13      THE COURT:  Yes.

14      MR. BLOOM:  -- the sentence reads the employer

15  may change or add additional investment options at its

16  discretion, provided, however, the Trustee Agreement

17  is required for the addition of company stock.

18      THE COURT:  Uh-huh.

19      MR. BLOOM:  Now this language was quoted in the

20  response and the reply from defendants was that well,

21  employer here simply refers to Constellation, refers

22  to it in its settlor capacity as opposed to its

23  fiduciary capacity.

24      However, I'm just going to switch to a different

25  page of this Agreement.  Do you see definition of 1.8

1   there?

2          THE COURT:  And what page are we on now?

3          MR. BLOOM:  This is the third page of the PDF,

4   which I believe is page two of the unamended Trust

5   Agreement.

6          THE COURT:  Okay.  I've got it.

7          MR. BLOOM:  Here, the Trust Agreement defines

8   employer to be Constellation Energy Group or any

9   successor company, and includes any authorized

10  designee of the employer, including the Plan

11  Administrator.

12         So the argument in the reply that that language

13  that Constellation has discretion to choose stock

14  options doesn't seem to quite match up.  This reading

15  is definitely, or these documents definitely support

16  the reading that there is a fiduciary at Constellation

17  picking these investment options, which would be the

18  case, as I think even defendants concede, with the

19  other investment funds.

20         Now one final thing before I move away from this

21  Trust Agreement, if you go to provision 10.4, which is

22  on the 15th page of the PDF, and I believe page 14 of

23  the Trust Agreement.

24         THE COURT:  Okay.

25         MR. BLOOM:  The Trust Agreement notes that in

1    any conflict with the Plan document, in any conflict

2    between the provisions of the Plan document and this

3    Agreement, the provisions of this Trust Agreement

4    shall prevail.

5          So under this document, the clear import is that

6    the investment fiduciary as the Plan Administrator at

7    Constellation had fiduciary discretion to select

8    investment options, including company stock.

9          THE COURT:  Okay.

10          MR. BLOOM:  But again, now this Trust Agreement,

11   my understanding of the Trust Agreement is that this

12   is the Trust Agreement for both plans, for both the

13   Nine Mile Plan and the Constellation plan.

14          Under the Nine Mile Plan, I mean I don't think

15   there is any doubt that there is discretion there

16   about company stock.  I mean the Plan says the Plan

17   Administrator may direct that matching contributions

18   will be invested in the CEG stock fund, and that's at

19   page 47.  I believe that is cited in our response.

20          THE COURT:  It says that the Plan Administrator

21   may direct that matching contributions will be

22   invested in the Constellation Group.

23          MR. BLOOM:  May direct, that's right.

24          THE COURT:  Right, right.

25          MR. BLOOM:  Also I noted that defense counsel

1          here today characterized this Plan as an ESOP, an

2          Employee Stock Ownership Plan, but I was unable to

3          locate that language in the Nine Mile Plan document.

4               THE COURT:  Does it make a difference if it's an

5          ESOP or an EIAP for purposes of the presumption of

6          prudence or anything else?

7               MR. BLOOM:  Ultimately, ultimately, no, Your

8          Honor.

9               Okay.  If you take look at Section 404(a)(1)(d)

10         of ERISA, that's D as in delta, ERISA has laid out a

11         fiduciary duty to obey Plan documents, but in the same

12         breath as the statute that Congress created that duty,

13         it also limited it.  It limited it to situations where

14         the Plan documents are consistent with ERISA.

15              Now ERISA, of course, was designed to protect

16         retirement income security, and so it contains

17         numerous provisions about vesting and vesting

18         schedules, and many of those are proposed by a vehicle

19         saying the Plan documents must contain these types of

20         provisions.

21              So this is a way of saying that even if the Plan

22         document is inconsistent with the provisions of ERISA,

23         that the trustee has a duty to look beyond the Plan

24         document and consider the other provisions of ERISA,

25         for example, the duty of prudence.

1          Now in their reply the defendants say, the reply

2     to oppose the motion to dismiss on page six,

3     plaintiffs offer no case where a court found a

4     defendant liable for failing to take some action that

5     the defendant never was authorized to take.

6          The two cases that the plaintiffs cited on that

7     point were the Enron case, and I will start there

8     first.  Judge Harmon, you know, was dealing with a

9     situation where matching contributions were to be

10    "primarily in company stock."  What Judge Harmon ruled

11    in that context was moreover, an investment fiduciary

12    must disregard Plan documents that following their

13    terms would be imprudent.

14          The ADP case was the other case cited by

15    plaintiffs in their response.  Although defendants

16    correctly point out that the Court in ADP did find

17    discretion, there was dispute about that and in the

18    ruling said even if there was no discretion regarding

19    company stock, a fiduciary cannot escape liability

20    merely by pointing to the Plan as requiring it to act

21    as it did.  Even for a fiduciary to act consistent

22    with the Plan's directives, the fiduciary may be

23    liable if the actions were not in the participants'

24    best interests, e.g., they were found to be imprudent.

25          I believe this Court had a similar ruling in the

1          In re Mutual Funds case, and also the Morgan Stanley

2     case submitted by plaintiffs' second supplemental

3     authority out of the Southern District of New York

4     also makes that same ruling.

5          There, the Court found no discretion, said the

6     Plan documents required there to be an investment in

7     company stock; but it nevertheless held there was

8     still a duty of prudence imposed by the statute.

9          That again was I believe Exhibit C to the second

10    supplemental authority, although I bring that up now

11    because we did make that plain or talked about that in

12    our second supplemental filing.

13         I guess one last point before I move on from

14    there, even the Moench case itself in its holding that

15    the presumption was rebutted, the way the Moench court

16    phrased it was the trustees have a duty in which they

17    can effectuate the purposes of the trust only by

18    deviating from the trust direction.

19         So there are some circumstances where even if

20    there is no discretion, the fiduciary must

21    nevertheless look past that.

22         THE COURT:  Right.

23         MR. BLOOM:  Here, while the fiduciaries were

24    examining the prudence of the company stock for their

25    Nine Mile Plan, perhaps they could have considered the

1    prudence of that stock for the Constellation Plan as

2    well.

3         THE COURT:  When you say the fiduciaries were

4    examining prudence, you just mean you're getting back

5    to the difference in the language of the Plans?

6         MR. BLOOM:  Right.  That's right.

7         THE COURT:  Okay.

8         MR. BLOOM:  The fiduciaries had a duty, and had

9    they been exercising that duty on behalf of the Nine

10   Mile Plan, then they would conceivably have been able

11   to apply some of that same analysis in consideration

12   of the stock as far as the Constellation Plan goes.

13        But turning to the Constellation Plan itself, I

14   think the Court pointed out earlier that the one or

15   more language in Section 5.1(a) would not be violated

16   if the company stock was not offered as an option, and

17   if you turn to 5.1(d), there's a limitation where

18   company stock must only initially be invested in the

19   Company Stock Fund.

20        THE COURT:  Suggesting that they would still

21   have to have a Company Stock Fund available for the

22   matching contributions.

23        MR. BLOOM:  There's no doubt that the Plan

24   comprehends the existence of a Company Stock Fund.

25        THE COURT:  Right.

1          MR. BLOOM:  The question is whether that fund

2     has to be offered or whether any participant's money

3     has to be in it.

4          THE COURT:  So you're going to get to the

5     Complaint and what's alleged in the Compliant and what

6     the circumstances were, going back to my initial

7     questions.

8          It is obviously a, what seemed to be me obvious,

9     a very hard decision for a fiduciary to know what is

10    that point?  When should they go against what

11    certainly appears to be the primary purpose of the

12    Plan?

13         Are you suggesting, and can you identify a

14    point, and did you really mean January 30, 2008, and

15    tell me why, where you think the fiduciaries had an

16    obligation to sell off the company stock?

17         MR. BLOOM:  Well, quite obviously, the specific

18    date in which that obligation arose is going to depend

19    on the particular fiduciaries and what they knew and

20    what they should have known.  So starting the Class

21    Period January 30th, probably no time before January

22    30 did they have that obligation.

23         If you look at the statements that the company

24    was making throughout the summer and fall of 2008,

25    there are a few that really jump out here and I think

1    can help shed some light on this timing issue.  Yeah,

2    here we go.

3         On August 27, 2008 there was an earnings call.

4    So this is now more than two weeks before the Lehman

5    Brothers Bankruptcy.  Defendant Shattuck announced or

6    said that the company will have to reduce the capital

7    exposure to these businesses and do so in an

8    aggressive manner.  Those are at paragraphs 159 and

9    160 of the Complaint.

10        So at that point, clearly the people who are at

11   Constellation and making these decisions understand

12   that they don't have the liquidity that they needed,

13   the credit security to continue their very risky

14   profit-oriented business and are going to have to make

15   some changes.

16        Now paragraph 178 of the Complaint, this is

17   after the Lehman collapse now, Defendant Shattuck said

18   that they are "hard at work to reduce risks in

19   collateral requirements to adjust to a new environment

20   where prices have declined, markets are liquid and

21   credit is scarce.  We have changed the focus of our

22   commodities business to prioritize risk and collateral

23   reduction over the near-term realization of profits."

24        So those statements indicate a fundamental

25   change in course for Constellation's business, of

1     course, after the devastating losses of the company

2     stock and the devastating losses to the balances of

3     the retirement plan of the people who invested in the

4     company stock through the Company Stock Fund.

5          THE COURT:  I mean there's obviously a loss that

6     was devastating for a lot of people.  If you start at

7     that August 27th earnings call, what happens a couple

8     weeks later is Lehman goes bankrupt.

9          MR. BLOOM:  That's right.

10         THE COURT:  Are you saying that the

11    Constellation fiduciaries, whoever they were, should

12    have forecasted that bankruptcy?

13         MR. BLOOM:  No, Your Honor.  What's going on

14    here is that the fiduciaries knew they were exposed.

15    They knew that the company's model was unsustainable

16    and that the company was at risk.  What the

17    allegations in the complaint are is that they knew the

18    price of the stock was inflated.

19         What all of these things go back to is that

20    their knowledge that what it is trading for is more

21    than what it's worth.  What this August 27th call is,

22    that's an outward public acknowledgment of what many

23    of them may have known there for sometime.  So what

24    they're thinking about is sort of unknowable on the

25    outside prior to discovery, prior to taking

1    depositions, reading the corporate minutes, and things

2    like that.

3         So what this indicates is that they were aware

4    that the risk was there, and it happened about two

5    weeks later the risk materialized.  They were no

6    longer able to obtain the credit that they needed to

7    manage their commodities business, and in this case,

8    it really pushed the company pretty far down the road

9    to insolvency.

10        They got an offer from Warren Buffett, which

11   they agreed to take, to buy the entire company for,

12   you know, $4.6 billion, a deal they later backed out

13   of; but nevertheless, at the end of this whole

14   process, it ended up, as paragraph 178 of the

15   Complaint makes clear, changing the focus of their

16   business and selling a 50 percent interest in five of

17   their power plants to EDF for billions of dollars.

18   Again, they needed this liquidity to stay going in any

19   form at that point.

20        But I don't have the specific date where it was

21   per se, that was the date they had to sell the stock

22   prior to, prior to knowing more about what actually

23   happened inside the company.

24        THE COURT:  Okay.

25        MR. BLOOM:  I wanted to also look at briefly

1    what the Moench court held was sufficient to rebut the

2    presumption of prudence.  On page 572 of the Moench

3    decision, the Court ruled when all is said and done,

4    this is precisely the argument that the plaintiff

5    makes in that case.  There was a precipitous decline

6    in the statewide stock.  The Committee had knowledge

7    of its impending collapse, and they focused on the

8    members' conflicted status.

9        There, the people had the dual responsibilities

10   as corporate officers and as ERISA fiduciaries and

11   that conflict, in light of the decline, in light of

12   their knowledge about the inflation, the Court ruled

13   that was sufficient to rebut the Moench presumption in

14   the Moench case itself.

15       Those are very much like the circumstances we

16   have in this case.

17       THE COURT:  I mean the timing is difficult, but

18   hadn't it been going on for some significant time

19   period in the Moench case?

20       You can go back and look at the specific facts,

21   but --

22       MR. BLOOM:  That's right.  I mean among the

23   other facts that the court in Moench considered, I

24   believe on page 557 of that decision, they commented

25   that the company had a lack of quality management, had

1    unsound credit practices, and inadequate loan loss

2    reserves, all of which could have been taken right out

3    of the Complaint in this case.

4        Again, one last thing before turning away from

5    Moench -- well, actually that makes sense.

6        You asked before who were the fiduciaries and

7    what are the fiduciaries' responsibilities?  There are

8    a few sets of fiduciaries in this case.  You've got

9    Defendant Behlert, who is the Plan Administrator for

10   both plaintiffs.

11       You have the Investment Committee which is

12   described in the Constellation Plan and has

13   responsibility for selecting investment options.

14       You have Defendant Shattuck, who was on the

15   Board of Directors of Constellation, and the Board of

16   Directors of Constellation appointed people to the

17   Investment Committee.

18       You also have the two entities themselves, Nine

19   Mile and Constellation.

20       I do want to point out that the Nine Mile Plan

21   does name two different Plan Administrators, which is,

22   as far as I know, acceptable under ERISA to have two

23   different named fiduciaries, both Nine Mile itself and

24   the Plan Administrator, who in that case was Behlert.

25       THE COURT:  Constellation does not do that?

1          MR. BLOOM:  No.  Constellation is not itself the

2     Plan Administrator.  Constellation is the Plan

3     sponsor, and its fiduciary status comes up in a few

4     different ways.

5          Constellation is an entity that has

6     responsibility for the actions of all of its

7     employees.  All of their employees are in some sense

8     the actions of Constellation, and it's also, and this

9     is just basic principles of corporate law, it is also

10    imputed with the knowledge of, at the very least, its

11    officers and directors, such as Shattuck and the

12    Investment Committee defendants and Defendant Behlert.

13    So what they knew, Constellation also knew.

14         Now Constellation and Shattuck are not named as

15    prudence defendants because they weren't the ones

16    responsible for choosing the investment option

17    directly.

18         However, and this is a key point, the defendants

19    argue that the duty to monitor is a purely derivative

20    duty, but it's really not.  The duty to monitor has a

21    number of components, and one of those is to provide

22    information necessary for the monitoring fiduciary to

23    do their job.

24         So, for example, Shattuck, if he knows that the

25    stock is overvalued or, say, grossly overvalued, he

1    would have a duty to pass that information on to

2    Behlert and the Investment Committee if they didn't

3    know so that they could make the appropriate decision.

4    If they did know, and they didn't make the appropriate

5    decision, he would then have the duty to remove them.

6    So the duty to monitor is not purely a derivative

7    duty.

8         The duty to avoid conflict of interest is also

9    not purely derivative.  However, the co-fiduciary

10   duties and the knowing participation by a

11   non-fiduciary, those two are in fact derivative.  So

12   if there's no fiduciary breach, Counts IV and V are

13   out.

14        Just a few more points here.  As far as the duty

15   of loyalty, it does contain a duty to disclose, and

16   not just disclose material adverse information.  But

17   under Riggs, which is in the Fourth Circuit, the duty

18   to disclose is a core fiduciary duty, which predates

19   ERISA.

20        Now there are different aspects of the duty to

21   disclose on different individuals, and that's going to

22   depend to a certain extent on what they do.

23        However, Behlert, as the Plan Administrator,

24   ERISA Section 101 imposes the requirement of producing

25   a Summary Plan Description, and the named fiduciary is

1      often responsible for doing that, which is Defendant

2      Behlert, and in this case, the Summary Plan

3      Description specifically incorporated the SEC filings,

4      all Securities and Exchange Commission filings, if

5      memory serves.

6           So by incorporating those documents, she is

7      taking a fiduciary act that is different from the

8      corporate act of originally making those statements.

9      She is telling the participants all of these

10     statements are part of the Plan documents, and you can

11     re lay on them.

12          THE COURT:  That is where in the -- I've got the

13     SPD.  It's Exhibit J.  Yeah, J.

14          MR. BLOOM:  Exhibit J, the 29th page of the PDF.

15          THE COURT:  Okay.  The SEC filings are

16     incorporated in the prospectus by reference.

17          MR. BLOOM:  That's right.  That's the same with

18     Exhibit K, which is the Nine Mile SPD.

19          THE COURT:  Uh-huh.

20          MR. BLOOM:  I believe it's on the same page,

21     although these pages aren't numbered the same way, not

22     on my copy at least.  It's on page 28.

23          MR. MATHIAS:  On page 28 of the document.

24          MR. BLOOM:  Yes, page 28.

25          THE COURT:  Okay.

1          MR. BLOOM:  Also, while we have the Summary Plan

2     Description in front of us, on page ESP-13 of Exhibit

3     J --

4          THE COURT:  The incorporation language, is there

5     something that sort of continually updates that?  When

6     you get a new SPD, does it update which SEC filings

7     are incorporated?

8          I mean these particular exhibits at least are

9     incorporating 2002, and 2003.

10         MR. BLOOM:  That's right.  And after those

11    bullet points it says in addition, you may receive

12    without charge, upon written or oral request,

13    Constellation Energy's Annual Report to shareholders

14    for its latest fiscal year and copies of all reports.

15         The fourth bullet point there, all documents

16    filed by Constellation Energy Group pursuant to

17    various sections of the Securities Act after the date

18    of this prospectus and prior to the termination of the

19    offering.

20         THE COURT:  I'm sorry, where?

21         MR. BLOOM:  That's the fourth bullet point there

22    on page 26 of Exhibit J.

23         THE COURT:  Oh, and prior to the termination of

24    the offering of the securities offered hereby.

25         MR. BLOOM:  Right.

1          THE COURT:  Okay.

2          MR. BLOOM:  I wanted to point out one last thing

3     about the SPD.  This is still on Exhibit J.  This is

4     page 16 of the exhibit, with the page number ESP-13 at

5     the bottom.

6          THE COURT:  Okay.

7          MR. BLOOM:  There's the statement that

8     Constellation Energy Group reverses the right to

9     modify or withdraw purchase and sale rights to

10    Constellation Energy Group stock for any given day to

11    protect its shareholders.

12         THE COURT:  Right.

13         MR. BLOOM:  So that language again seems to

14    indicate that, you know, maybe you have the right to

15    participate in the Company Stock Fund today, but maybe

16    that's not going to be there forever.

17         THE COURT:  Well, it's giving Constellation, I

18    assume Mr. Mathias would probably argue in it

19    settlor's function, the right to change things.

20         MR. BLOOM:  I think the point of the language is

21    that it's sort of ambiguous as to which function

22    Constellation would be acting in that capacity.  But,

23    of course, as we point out, Constellation is not a

24    prudence defendant in this matter.  But it would be

25    possible for them to delicate that authority and not

1      be in violation of this language.

2          The one last thing, the one last point I wanted

3      to make today is about the duty of --

4          Oh, actually there was one more about the duty

5      of prudence itself.  What does being a prudent

6      fiduciary look like?

7          The DiFelice case actually has a fair amount to

8      say about that.  You look both at the merits of the

9      transaction or the lack of a transaction, and the

10     thoroughness of the investigation.

11         Now the allegation in the Complaint, at

12     paragraph 200, is that there was no investigation

13     whatsoever.  Of course, because this is a motion to

14     dismiss, there's no statement denying that, supplying

15     any kind of process that it did in fact take.

16         THE COURT:  I'm sorry.  I need to interrupt you

17     for a second.  That hum is getting louder.  Do you

18     need the computer?  Okay.  Is that better?

19         MR. BLOOM:  So if we look to the prudence of a

20     particular fiduciary act, that is the standard.

21         Now the defendants argued earlier that you don't

22     ever look to that prior to dealing with the Moench

23     presumption.  However, the Moench case itself says if

24     the fiduciary cannot show that he or she impartially

25     investigated options, courts should be willing to find

1        abuse of discretion.  That is again I believe on 572

2        of the Moench decision.

3               THE COURT:  Somewhere there is still --

4               MR. BLOOM:  I'm almost finished.

5               The last point I wanted to make was about the

6        404(c) defense.

7               THE COURT:  Okay.

8               MR. BLOOM:  Which, of course, in the Fourth

9        Circuit is not really an issue.  The court in DiFelice

10       ruled in footnote 3 of the opinion that even if

11       defendants managed to satisfy as a factual matter the

12       voluminous requirements of the 404(c) regulation, the

13       fiduciaries are still liable for the selection of Plan

14       investment options.

15              So those are two different sets of fiduciary

16       duties, and if they violated the one, that's a

17       problem, regardless of whether they also complied with

18       404(c).

19              Do you have any questions?

20              THE COURT:  I'm all right.

21              If you would like to reply, that's fine.

22              MR. MATHIAS:  Your Honor, just a few things, and

23       if you don't mind, I'll stay here and maybe avoid that

24       microphone.

25              THE COURT:  Sure.

1          MR. MATHIAS:  I said at the outset that the

2     facts really do matter and that the timing matters,

3     and the state of knowledge matters.  I think that's as

4     true now as when I said it at the beginning of this.

5          The law is obviously very important, but I don't

6     think the law, and the distinctions that people have

7     been trying to draw on the law here really is outcome

8     determinative.  It's how the facts apply to that law.

9          In the Moench case, it was a two-year period.

10     The company had lost 98 percent of its value.  It had

11     dropped to 25 cents a share.  Federal regulators had

12     uncovered regulatory violations.  The FDIC had come in

13     and taken over the subsidiary, and the company

14     ultimately filed for bankruptcy.

15          That is exactly the kind of slow march to death

16     where this kind of thing, where a duty for a fiduciary

17     would come into play.

18          That is dramatically different from the

19     situation we are dealing with here where, as we talked

20     about, fiduciaries looking at these situations, it's a

21     fast-moving situation, where there has been zero in

22     the way of allegations that the fiduciaries knew

23     something that the rest of the market didn't in

24     advance.  They're simply saying we should have

25     predicted what was going to happen in the market.

1          As to the point about Mr. Shattuck, and the

2     comments that Mr. Shattuck made, first of all, even

3     today there is no information to suggest that if the

4     credit markets hadn't completely seized up as opposed

5     to, you know, having some rocky times, which is the

6     normal situation in the last seven years, there is not

7     a shred of evidence that the company would have been

8     in the situation it was in.

9          The only time it got into a dire situation was

10    in the first week of September, which was an

11    extraordinary chain of events, external events to the

12    company, not internal events, like in Moench and all

13    the other cases, where a fiduciary would have some

14    reason to know about those internal events, and the

15    company reacted within days, not two years.

16         The other thing, and I don't know that it

17    ultimately matters, but that I find ironic, is to

18    point out that Mr. Shattuck making comments in August

19    about the company looking to increase its liquidity in

20    light of the rocky credit markets that exited somehow

21    is a bad thing.  They said that we were supposed to

22    de-risk.

23         Well, you don't predict the future, but Mr.

24    Shattuck is looking at a market and he's making

25    reasonable decisions along the way.  He doesn't know.

1          If somebody had told him in August that Lehman

2     was going to go into bankruptcy and that the

3     government wasn't going to bail them out, and the

4     credit markets would be totally unavailable, then the

5     company might have acted differently.  But you don't

6     assume that.  That's the whole point.

7          Keep in mind that in August, the company went

8     out and got $2 billion in additional liquidity to

9     close in October.  Everybody in the world thought that

10    was a reasonable solution and that nothing between

11    August and October would intervene to make credit

12    totally unavailable.

13         So that complete absence of any evidence or

14    knowledge or should have known of an impending

15    collapse really is what distinguishes our case from

16    all those other cases.

17         I just want to make a couple related points in

18    response to plaintiffs' counsel.

19         They don't specify a time when they think it

20    became inappropriate or imprudent for the fiduciary to

21    continue to offer the stock.  That's their requirement

22    under the pleading rules.  I mean they have to say

23    that at some point in time the fiduciary became bound

24    to divest and explain why, what it was that fiduciary

25    knew about, not the past performance of the company,

1    but the future performance of the company that made

2    them bound to divest.

3         So they simply failed under that pleading burden

4    and I think essentially acknowledged that the January

5    30th date isn't even plausible, but they haven't

6    specified any other date.

7         I think that's really all I have right now, Your

8    Honor.  Thank you.

9         THE COURT:  Thank you.  Mr. Gillespie, anything

10   else?

11        MR. GILLESPIE:  Nothing further, Your Honor.

12        THE COURT:  Okay.  Mr. Bloom, anything else?

13        MR. BLOOM:  Nothing further, Your Honor.

14        THE COURT:  All right.  Well, again, thank you

15   all very much.  I appreciate you all dealing with

16   difficult circumstances.  However it comes out, as I

17   said before, a lot of people lost a lot of money.  It

18   was not what anybody would have wanted.

19        But thank you very much.  It was helpful.  I

20   will give you a decision reasonably soon.

21        (The proceedings concluded.)

22

23

24

25

1          REPORTER'S CERTIFICATE

2          I hereby certify that the foregoing transcript in

3      the matter of Ronald W. Hays, et al., Plaintiffs vs.

4      Constellation Energy Group, Inc., et al., Defendants,

5      Civil Action No. CCB-08-2663, ERISA Litigation, before

6      the Honorable Catherine C. Blake, United States

7      District Judge, on June 17, 2010 is true and accurate.

8

9                     _____

10                         Gail A. Simpkins

11                     Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 20:15
**$13** [1] - 24:15
**$30.76** [1] - 23:14
**$32** [1] - 24:25
**$47.99** [1] - 22:21
**$58.38** [1] - 22:20
**$83** [4] - 19:22, 19:23, 21:8, 21:10
**$92** [1] - 21:3

## 1

**1** [1] - 37:3
**1.8** [1] - 37:25
**10.4** [1] - 38:21
**101** [1] - 51:24
**11th** [1] - 21:19
**12th** [2] - 22:6, 22:19
**14** [1] - 38:22
**159** [1] - 45:8
**15th** [4] - 22:5, 22:7, 22:20, 38:22
**16** [2] - 11:7, 54:4
**160** [1] - 45:9
**16th** [1] - 23:11
**17** [2] - 1:10, 61:7
**178** [2] - 45:16, 47:14

## 2

**2** [3] - 20:4, 37:3, 59:8
**20** [2] - 9:22, 9:25
**200** [1] - 55:12
**2001** [1] - 18:25
**2002** [1] - 53:9
**2003** [1] - 53:9
**2008** [8] - 8:8, 18:20, 20:24, 21:7, 36:7, 44:14, 44:24, 45:3
**2010** [2] - 1:10, 61:7
**215** [2] - 35:12, 36:4
**216** [2] - 35:13, 35:19
**23** [1] - 9:23
**24** [1] - 9:25
**25** [1] - 57:11
**26** [2] - 25:2, 53:22
**27** [1] - 45:3
**27th** [2] - 46:7, 46:21
**28** [3] - 52:22, 52:23, 52:24
**28th** [1] - 20:15
**29th** [1] - 52:14

## 3

**3** [1] - 56:10
**30** [2] - 44:14, 44:22
**30th** [3] - 20:24, 44:21, 60:5
**31** [1] - 37:1
**32** [2] - 25:1, 25:2
**37** [1] - 32:24

## 4

**4.6** [1] - 47:12
**404(a)(1)(d** [2] - 14:16, 40:9
**404(c** [2] - 56:6, 56:12
**404(c)** [1] - 56:18
**47** [1] - 39:19

## 5

**5.1(a** [1] - 43:15
**5.1(a)** [1] - 11:7
**5.1(d** [1] - 43:17
**50** [1] - 47:16
**557** [1] - 48:24
**572** [2] - 48:2, 56:1

## 6

**68** [1] - 20:16

## 7

**73** [1] - 20:15

## 8

**8-K** [1] - 22:22

## 9

**9** [1] - 21:10
**98** [1] - 57:10

## A

**ability** [1] - 21:4
**able** [7] - 13:15, 19:7, 22:15, 24:20, 34:14, 43:10, 47:6
**above-entitled** [1] - 1:12
**absence** [2] - 15:5,
59:13
**absent** [1] - 21:4
**abuse** [2] - 17:8, 56:1
**acceptable** [1] - 49:22
**according** [2] - 20:21, 20:23
**Account** [1] - 9:7
**accounting** [1] - 25:12
**accurate** [1] - 61:7
**acknowledge** [1] - 32:24
**acknowledged** [1] - 60:4
**acknowledgment** [1] - 46:22
**act** [11] - 5:14, 6:8, 6:17, 14:4, 15:14, 26:19, 41:20, 41:21, 52:7, 52:8, 55:20
**Act** [1] - 53:17
**acted** [2] - 8:18, 59:5
**acting** [3] - 14:2, 14:13, 54:22
**action** [3] - 5:25, 33:15, 41:4
**Action** [2] - 3:5, 61:5
**actions** [3] - 41:23, 50:6, 50:8
**activity** [1] - 25:11
**actual** [1] - 3:16
**add** [1] - 37:15
**addition** [2] - 37:17, 53:11
**additional** [4] - 20:4, 21:23, 37:15, 59:8
**address** [4] - 4:10, 4:14, 4:20, 32:7
**addressed** [1] - 34:11
**adds** [1] - 35:19
**adjust** [1] - 45:19
**Administrator** [9] - 14:6, 38:11, 39:6, 39:17, 39:20, 49:9, 49:24, 50:2, 51:23
**Administrators** [1] - 49:21
**admit** [1] - 28:3
**adopted** [1] - 16:2
**ADP** [2] - 41:14, 41:16
**advance** [6] - 6:6, 8:25, 18:22, 19:14, 25:16, 57:24
**advanced** [3] - 23:22, 25:5, 25:10
**adverse** [2] - 5:5, 51:16
**advice** [2] - 26:14, 27:7
**advisor** [1] - 28:10
**afternoon** [4] - 3:8,
3:10, 4:22, 34:20
**agencies** [1] - 23:12
**aggressive** [1] - 45:8
**agreed** [1] - 47:11
**agreement** [2] - 3:15, 36:24
**Agreement** [14] - 36:16, 37:7, 37:16, 37:25, 38:5, 38:7, 38:21, 38:23, 38:25, 39:3, 39:10, 39:11, 39:12
**ahead** [5] - 26:11, 28:4, 28:5, 30:2, 32:2
**AIG** [2] - 23:11
**AL** [2] - 1:4, 1:7
**al** [4] - 1:21, 3:6, 61:3, 61:4
**allegation** [8] - 19:13, 21:12, 22:10, 34:7, 34:12, 35:24, 55:11
**allegations** [12] - 7:2, 7:23, 8:11, 18:10, 29:13, 33:25, 35:7, 35:8, 35:10, 36:1, 46:17, 57:22
**allege** [4] - 8:15, 23:19, 32:12, 32:25
**alleged** [4] - 9:2, 17:7, 30:10, 44:5
**alleges** [1] - 35:13
**almost** [2] - 24:9, 56:4
**alone** [1] - 35:6
**alteration** [1] - 5:17
**alternate** [1] - 31:23
**ambiguous** [1] - 54:21
**Amended** [4] - 7:25, 18:13, 18:15, 35:12
**Amendment** [1] - 37:6
**amount** [3] - 4:2, 55:7
**analysis** [3] - 28:25, 29:5, 43:11
**announce** [1] - 24:21
**announced** [5] - 19:18, 20:3, 21:22, 26:10, 45:5
**Annual** [1] - 53:13
**annual** [1] - 31:8
**answer** [1] - 26:17
**anytime** [1] - 5:23
**anyway** [1] - 4:8
**Appendix** [1] - 11:24
**applicability** [1] - 17:11
**applies** [1] - 15:24
**apply** [5] - 7:21, 16:15, 17:24, 43:11, 57:8
**appointed** [1] - 49:16
**appreciate** [1] - 60:15
**appropriate** [3] - 25:3, 51:3, 51:4
**argue** [2] - 50:19, 54:18
**argued** [1] - 55:21
**argument** [8] - 5:12, 10:21, 10:22, 33:23, 35:20, 38:12, 48:4
**arise** [3] - 14:20, 27:11, 29:12
**arisen** [1] - 15:21
**arises** [1] - 26:21
**arose** [2] - 14:4, 44:18
**articulated** [1] - 19:10
**aspects** [1] - 51:20
**assume** [2] - 54:18, 59:6
**assumed** [1] - 32:4
**August** [9] - 20:15, 21:19, 45:3, 46:7, 46:21, 58:18, 59:1, 59:7, 59:11
**authority** [3] - 42:3, 42:10, 54:25
**authorized** [2] - 38:9, 41:5
**automated** [1] - 19:16
**automatically** [3] - 9:19, 12:5, 18:5
**availability** [1] - 7:9
**available** [3] - 13:17, 13:23, 43:21
**avoid** [4] - 35:3, 35:18, 51:8, 56:23
**aware** [1] - 47:3

## B

**backed** [1] - 47:12
**background** [1] - 7:22
**bad** [2] - 5:4, 58:21
**bail** [2] - 22:13, 59:3
**bailed** [1] - 22:14
**balances** [1] - 46:2
**Baltimore** [1] - 1:9
**bankrupt** [1] - 46:8
**bankruptcy** [6] - 20:17, 22:9, 22:12, 46:12, 57:14, 59:2
**Bankruptcy** [1] - 45:5
**bare** [1] - 33:25
**basic** [2] - 31:2, 50:9
**basis** [2] - 6:22, 19:5
**Bear** [1] - 22:14
**bear** [1] - 34:12
**became** [2] - 59:20, 59:23
**become** [1] - 18:21
**becoming** [1] - 8:5

**began** [2] - 19:18, 24:10
**beginning** [1] - 57:4
**behalf** [3] - 32:6, 34:25, 43:9
**Behlert** [8] - 14:7, 14:9, 49:9, 49:24, 50:12, 51:2, 51:23, 52:2
**bench** [1] - 36:3
**benefits** [2] - 30:22, 31:15
**best** [1] - 41:24
**better** [1] - 55:18
**between** [7] - 3:18, 8:25, 17:13, 27:18, 36:16, 39:2, 59:10
**beyond** [1] - 40:23
**billion** [3] - 20:4, 47:12, 59:8
**billions** [1] - 47:17
**bit** [1] - 3:19
**Blake** [2] - 1:13, 61:6
**BLOOM** [47] - 32:1, 34:20, 34:24, 35:23, 36:8, 36:12, 36:15, 36:19, 37:2, 37:8, 37:11, 37:14, 37:19, 38:3, 38:7, 38:25, 39:10, 39:23, 39:25, 40:7, 42:23, 43:6, 43:8, 43:23, 44:1, 44:17, 46:9, 46:13, 47:25, 48:22, 50:1, 52:14, 52:17, 52:20, 52:24, 53:1, 53:10, 53:21, 53:25, 54:2, 54:7, 54:13, 54:20, 55:19, 56:4, 56:8, 60:13
**Bloom** [4] - 1:18, 34:21, 34:24, 60:12
**Board** [2] - 49:15
**bottom** [2] - 26:2, 54:5
**bound** [2] - 59:23, 60:2
**breach** [6] - 23:19, 32:15, 32:22, 33:1, 35:3, 51:12
**breached** [2] - 32:11, 32:18
**breaches** [1] - 14:12
**breath** [1] - 40:12
**brief** [2] - 4:19, 33:23
**briefed** [1] - 33:7
**briefing** [1] - 34:14
**briefly** [3] - 29:25, 33:11, 47:25
**bring** [1] - 42:10
**Brother** [1] - 34:10

**Brothers** [1] - 45:5
**buckets** [2] - 7:1, 7:22
**Buffett** [1] - 47:10
**bullet** [3] - 53:11, 53:15, 53:21
**burden** [1] - 60:3
**business** [12] - 8:2, 8:4, 18:12, 18:23, 19:3, 20:1, 45:14, 45:22, 45:25, 47:7, 47:16
**businesses** [1] - 45:7
**buy** [1] - 47:11

**C**

**calculation** [2] - 8:7, 19:12
**candidly** [1] - 32:24
**cannot** [4] - 14:12, 19:5, 41:19, 55:24
**capacity** [4] - 33:25, 37:22, 37:23, 54:22
**capital** [1] - 45:6
**case** [47] - 1:12, 3:4, 4:21, 4:22, 6:21, 7:3, 7:21, 14:14, 16:6, 17:6, 20:20, 23:6, 23:17, 25:19, 25:24, 26:25, 28:14, 28:15, 29:15, 29:16, 29:22, 30:18, 31:5, 35:5, 35:9, 38:18, 41:3, 41:7, 41:14, 42:1, 42:2, 42:14, 47:7, 48:5, 48:14, 48:16, 48:19, 49:3, 49:8, 49:24, 52:2, 55:7, 55:23, 57:9, 59:15
**cases** [11] - 6:9, 6:15, 9:15, 15:7, 17:15, 17:16, 25:8, 29:22, 41:6, 58:13, 59:16
**Catch-22** [2] - 16:24, 24:13
**Catherine** [1] - 1:13, 61:6
**caused** [1] - 33:14
**CCB-08-2662** [1] - 1:6
**CCB-08-2663** [1] - 61:5
**CCB-08-cv-2662** [1] - 3:5
**CEG** [3] - 11:12, 13:11, 39:18
**cents** [1] - 57:11
**certain** [2] - 14:20, 51:22
**certainly** [9] - 16:1,

18:25, 20:8, 21:11, 21:12, 27:6, 28:16, 30:18, 44:11
**CERTIFICATE** [1] - 61:1
**certify** [1] - 61:2
**chain** [1] - 58:11
**change** [5] - 5:23, 10:3, 37:15, 45:25, 54:19
**changed** [1] - 45:21
**changes** [1] - 45:15
**changing** [3] - 13:16, 13:17, 47:15
**character** [1] - 13:16
**characterized** [1] - 40:1
**charge** [1] - 53:12
**choice** [1] - 5:18
**choose** [1] - 38:13
**choosing** [1] - 50:16
**chose** [1] - 35:13
**Circuit** [8] - 28:22, 29:17, 29:20, 30:21, 33:17, 35:4, 51:17, 56:9
**Circuits** [1] - 16:1
**circuits** [1] - 29:23
**circumstance** [8] - 15:3, 15:4, 15:15, 15:21, 16:7, 20:9, 26:22, 29:11
**circumstances** [11] - 5:7, 6:20, 14:21, 17:5, 27:11, 28:4, 29:8, 42:19, 44:6, 48:15, 60:16
**cited** [4] - 36:13, 39:19, 41:6, 41:14
**Civil** [2] - 3:5, 61:5
**CIVIL** [1] - 1:6
**claim** [12] - 19:5, 30:3, 30:4, 31:18, 32:14, 32:15, 32:16, 32:21, 33:12, 33:13, 35:2, 35:11
**claims** [2] - 32:20, 33:10
**Class** [3] - 20:20, 36:10, 44:20
**clear** [6] - 15:1, 18:2, 33:17, 35:1, 39:5, 47:15
**clearly** [2] - 17:22, 45:10
**CLERK** [1] - 3:4
**climb** [1] - 19:19
**climbs** [1] - 33:2
**close** [1] - 59:9
**closed** [3] - 20:5,

22:19, 22:20
**co** [2] - 32:15, 51:9
**co-fiduciary** [2] - 32:15, 51:9
**collapse** [4] - 6:11, 45:17, 48:7, 59:15
**collateral** [4] - 8:6, 19:11, 45:19, 45:22
**colleagues** [2] - 34:13, 34:15
**coming** [1] - 29:23
**commented** [1] - 48:24
**comments** [2] - 58:2, 58:18
**Commission** [1] - 52:4
**Committee** [12] - 11:14, 11:19, 12:16, 12:18, 14:6, 14:8, 27:22, 48:6, 49:11, 49:17, 50:12, 51:2
**commodities** [2] - 45:22, 47:7
**Common** [8] - 9:7, 9:15, 9:24, 11:12, 11:17, 12:2, 13:6, 13:12
**companies** [3] - 5:1, 6:21, 22:25
**company** [92] - 3:23, 4:16, 5:9, 5:10, 5:15, 6:11, 7:9, 7:11, 7:14, 7:17, 8:3, 8:4, 8:13, 9:12, 9:14, 9:17, 9:19, 9:21, 12:6, 12:8, 16:8, 16:11, 16:12, 16:21, 17:18, 17:20, 17:21, 17:23, 18:3, 18:6, 19:3, 19:9, 20:3, 20:7, 20:10, 21:1, 21:22, 22:1, 22:3, 22:6, 24:2, 24:4, 24:9, 24:19, 24:22, 24:24, 25:6, 25:13, 25:15, 26:8, 26:15, 27:2, 27:3, 27:25, 30:7, 30:12, 30:19, 33:18, 35:11, 35:15, 37:17, 38:9, 39:8, 39:16, 41:10, 41:19, 42:7, 42:24, 43:16, 43:18, 44:16, 44:23, 45:6, 46:1, 46:4, 46:16, 47:8, 47:11, 47:23, 48:25, 57:10, 57:13, 58:7, 58:12, 58:15, 58:19, 59:5, 59:7, 59:25, 60:1

**Company** [5] - 43:19, 43:21, 43:24, 46:4, 54:15
**company's** [2] - 6:11, 46:15
**company-matching** [1] - 9:12
**compare** [1] - 25:8
**complaint** [4] - 35:7, 36:2, 36:6, 46:17
**Complaint** [13] - 7:25, 18:13, 18:15, 32:8, 33:13, 34:1, 35:12, 44:5, 45:9, 45:16, 47:15, 49:3, 55:11
**complaints** [1] - 34:5
**complete** [6] - 5:10, 5:21, 7:14, 16:9, 24:6, 59:13
**completed** [1] - 34:18
**completely** [2] - 16:7, 58:4
**Compliant** [1] - 44:5
**complied** [1] - 56:17
**components** [1] - 50:21
**comprehends** [1] - 43:24
**computer** [1] - 55:18
**concede** [1] - 38:18
**conceivably** [1] - 43:10
**concluded** [1] - 60:21
**conflict** [9] - 32:14, 33:11, 33:14, 33:21, 35:3, 39:1, 48:11, 51:8
**conflicted** [1] - 48:8
**conflicts** [1] - 35:18
**Congress** [1] - 40:12
**consider** [2] - 24:8, 40:24
**consideration** [1] - 43:11
**considered** [2] - 42:25, 48:23
**considering** [1] - 31:14
**consisted** [1] - 9:11
**consistent** [8] - 14:16, 14:18, 14:25, 15:5, 29:22, 35:8, 40:14, 41:21
**CONSTELLATION** [1] - 1:7
**constellation** [2] - 49:25, 50:1
**Constellation** [65] - 1:21, 3:6, 3:19, 4:14, 8:1, 8:9, 9:5, 9:7,

9:15, 9:24, 10:6, 10:10, 10:14, 10:25, 11:3, 11:8, 11:17, 11:23, 12:13, 13:6, 14:7, 14:15, 15:2, 17:13, 18:20, 18:24, 20:18, 22:11, 22:17, 22:21, 23:13, 32:6, 32:10, 32:16, 34:9, 36:17, 37:21, 38:8, 38:13, 38:16, 39:7, 39:13, 39:22, 43:1, 43:12, 43:13, 45:11, 46:11, 49:12, 49:15, 49:16, 49:19, 50:2, 50:5, 50:8, 50:13, 50:14, 53:13, 53:16, 54:8, 54:10, 54:17, 54:22, 54:23, 61:4
**Constellation's** [1] - 8:11, 9:10, 18:19, 45:25
**contain** [2] - 40:19, 51:15
**contains** [1] - 40:16
**context** [4] - 5:4, 5:8, 5:12, 41:11
**continually** [1] - 53:5
**continue** [7] - 3:22, 6:7, 23:25, 26:6, 28:12, 45:13, 59:21
**continued** [1] - 24:14
**continues** [1] - 23:12
**continuing** [3] - 3:25, 4:1, 26:16
**contrary** [1] - 26:6
**contribute** [1] - 4:1
**contributions** [13] - 3:22, 7:10, 9:11, 9:13, 10:9, 12:5, 12:21, 12:23, 18:5, 39:17, 39:21, 41:9, 43:22
**controlling** [1] - 3:17
**controls** [1] - 12:25
**copies** [1] - 53:14
**copy** [1] - 52:22
**core** [2] - 4:23, 51:18
**corporate** [7] - 30:19, 33:25, 35:22, 47:1, 48:10, 50:9, 52:8
**correct** [2] - 35:23, 37:9
**corrected** [1] - 19:15
**correctly** [4] - 28:15, 28:24, 36:5, 41:16
**counsel** [6] - 3:19, 28:10, 31:25, 35:2, 39:25, 59:18
**Count** [7] - 4:11, 30:4,

32:12, 32:13, 32:14, 32:15, 33:5
**Counts** [1] - 51:12
**counts** [4] - 4:15, 32:8, 32:9, 33:7
**couple** [4] - 3:11, 20:14, 46:7, 59:17
**course** [7] - 36:19, 40:15, 45:25, 46:1, 54:23, 55:13, 56:8
**court** [10] - 27:19, 28:23, 28:24, 35:17, 35:25, 41:3, 42:15, 48:1, 48:23, 56:9
**Court** [13] - 1:25, 3:4, 7:21, 28:21, 29:9, 33:10, 41:16, 41:25, 44:13, 48:14, 48:3, 48:12, 61:11
**COURT** [80] - 1:1, 3:2, 3:8, 3:11, 4:12, 4:17, 7:4, 7:7, 10:20, 11:6, 11:11, 11:25, 12:7, 12:10, 12:20, 13:4, 13:7, 13:19, 14:8, 16:13, 17:10, 20:11, 26:11, 27:15, 28:17, 28:20, 29:18, 30:2, 31:20, 31:24, 32:2, 34:19, 34:22, 35:19, 36:4, 36:11, 36:14, 36:18, 36:25, 37:5, 37:10, 37:13, 37:18, 38:2, 38:6, 38:24, 39:9, 39:20, 39:24, 40:4, 42:22, 43:3, 43:7, 43:20, 43:25, 44:4, 46:5, 46:10, 47:24, 48:17, 49:25, 52:12, 52:15, 52:19, 52:25, 53:4, 53:20, 53:23, 54:1, 54:6, 54:12, 54:17, 55:16, 56:3, 56:7, 56:20, 56:25, 60:9, 60:12, 60:14
**courts** [5] - 15:17, 16:2, 27:12, 30:24, 55:25
**create** [4] - 5:7, 16:24, 29:8, 33:20
**created** [1] - 40:12
**credit** [15] - 4:25, 6:23, 21:5, 22:2, 22:25, 24:6, 34:10, 45:13, 45:21, 47:6, 49:1, 58:4, 58:20, 59:4, 59:11
**critical** [1] - 3:18
**cursor** [1] - 37:12

**D**

**date** [6] - 44:18, 47:20, 47:21, 53:17, 60:5, 60:6
**dates** [1] - 23:18
**day-to-day** [1] - 6:22
**days** [3] - 10:1, 20:14, 58:15
**de** [1] - 58:22
**de-risk** [1] - 58:22
**deal** [3] - 5:4, 5:6, 47:12
**dealing** [6] - 6:13, 6:21, 41:8, 55:22, 57:19, 60:15
**death** [1] - 57:15
**decide** [4] - 5:21, 6:23, 7:17, 23:9
**decided** [1] - 7:18
**decides** [1] - 10:18
**decision** [8] - 14:24, 44:9, 48:3, 48:24, 51:3, 51:5, 56:2, 60:20
**decisions** [2] - 45:11, 58:25
**declaration** [1] - 37:4
**decline** [6] - 6:3, 6:7, 6:10, 48:5, 48:11
**declined** [1] - 45:20
**declining** [1] - 23:16
**defendant** [5] - 33:15, 41:4, 41:5, 45:5, 54:24
**Defendant** [5] - 45:17, 49:9, 49:14, 50:12, 52:1
**Defendants** [2] - 2:1, 61:4
**defendants** [13] - 4:10, 31:22, 32:11, 35:13, 37:20, 38:18, 41:1, 41:15, 50:12, 50:15, 50:18, 55:21, 56:11
**DEFENDANTS** [1] - 1:8
**defense** [4] - 15:17, 35:2, 39:25, 56:6
**deficiencies** [1] - 33:8
**defines** [1] - 11:21, 38:7
**definitely** [1] - 38:15
**definition** [1] - 37:25
**definitions** [2] - 11:20, 11:25
**degree** [1] - 25:14
**delicate** [1] - 54:25

**delta** [1] - 40:10
**denying** [1] - 55:14
**depositions** [1] - 47:1
**Derek** [1] - 37:3
**derivative** [6] - 32:21, 33:2, 50:19, 51:6, 51:9, 51:11
**DeSantis** [1] - 1:23
**described** [2] - 6:14, 49:12
**describes** [1] - 18:2
**Description** [6] - 31:9, 31:12, 31:14, 51:25, 52:3, 53:2
**designate** [1] - 10:14
**designates** [1] - 11:16
**designed** [1] - 5:4, 5:6, 40:15
**designee** [1] - 38:10
**detail** [3] - 4:19, 7:24, 20:19
**determinative** [1] - 57:8
**determined** [1] - 13:10
**detrimental** [1] - 33:15
**devastating** [3] - 46:1, 46:2, 46:6
**developed** [1] - 28:24
**development** [1] - 5:5
**deviating** [1] - 42:18
**DiFelice** [12] - 16:5, 16:6, 26:25, 33:17, 35:5, 35:8, 35:17, 35:25, 36:2, 55:7, 56:9
**difference** [9] - 3:24, 4:3, 4:5, 8:25, 17:10, 17:12, 18:7, 40:4, 43:5
**different** [15] - 3:18, 8:16, 9:23, 16:7, 17:25, 28:5, 37:24, 49:21, 49:23, 50:4, 51:20, 51:21, 52:7, 56:15, 57:18
**differently** [1] - 59:5
**difficult** [3] - 28:11, 48:17, 60:16
**dilemma** [1] - 17:3
**dire** [2] - 6:13, 58:9
**direct** [5] - 22:16, 33:24, 39:17, 39:21, 39:23
**direction** [1] - 42:18
**directives** [1] - 41:22
**directly** [1] - 50:17
**director** [1] - 33:18
**directors** [2] - 35:15, 50:11
**Directors** [2] - 49:15,

49:16
**disclose** [4] - 51:15, 51:16, 51:18, 51:21
**disclosed** [5] - 19:1, 19:4, 19:17, 21:21, 30:6
**disclosure** [1] - 34:15
**disclosures** [3] - 30:22, 30:23, 31:4
**discouraged** [1] - 16:12
**discovered** [1] - 19:16
**discovery** [3] - 28:8, 36:2, 46:25
**discretion** [23] - 5:21, 10:5, 10:24, 12:1, 12:18, 16:9, 17:9, 17:21, 26:19, 27:1, 27:2, 27:5, 27:10, 28:3, 37:16, 38:13, 39:7, 39:15, 41:17, 41:18, 42:5, 42:20, 56:1
**discuss** [2] - 7:23, 33:11
**discussed** [1] - 28:6
**discussion** [1] - 3:20
**disjunctive** [1] - 12:11
**dismiss** [5] - 3:7, 15:24, 18:16, 41:2, 55:14
**disobey** [3] - 5:8, 20:25, 21:17
**dispute** [1] - 41:17
**disregard** [1] - 41:12
**distinction** [2] - 10:17, 26:23
**distinctions** [1] - 57:6
**distinguishes** [1] - 59:15
**DISTRICT** [2] - 1:1, 1:2
**District** [5] - 1:14, 28:21, 29:24, 42:3, 61:7
**diversification** [1] - 5:11
**diversify** [2] - 7:16, 15:6
**divest** [7] - 5:14, 16:20, 16:25, 24:24, 28:4, 59:24, 60:2
**divested** [1] - 24:22
**divesting** [1] - 5:10
**divestiture** [1] - 7:14
**document** [8] - 36:13, 39:1, 39:2, 39:5, 40:3, 40:22, 40:24, 52:23
**documents** [12] - 27:22, 31:12, 36:20,

38:15, 40:11, 40:14, 40:19, 41:12, 42:6, 52:6, 52:10, 53:15
**dollars** [1] - 47:17
**done** [3] - 29:4, 29:6, 48:3
**doomed** [1] - 33:2
**double** [1] - 26:13
**doubt** [2] - 39:15, 43:23
**down** [10] - 20:15, 21:9, 21:10, 21:16, 21:25, 22:7, 23:25, 24:15, 26:6, 47:8
**downgrade** [2] - 8:6, 19:11
**downgraded** [1] - 23:11
**downward** [2] - 22:24, 23:13
**dramatically** [1] - 57:18
**draw** [1] - 57:7
**drop** [7] - 5:3, 5:5, 6:2, 6:18, 16:22, 21:11, 24:14
**dropped** [5] - 5:1, 19:17, 19:24, 20:13, 57:11
**dual** [1] - 48:9
**during** [3] - 18:20, 24:15, 36:9
**duties** [4] - 32:11, 32:23, 51:10, 56:16
**duty** [54] - 5:7, 5:11, 5:13, 5:14, 6:1, 7:8, 7:16, 14:4, 14:12, 14:20, 15:6, 15:21, 21:17, 23:6, 26:18, 26:20, 27:7, 27:18, 29:1, 29:8, 29:12, 30:1, 30:3, 31:17, 32:13, 33:1, 35:3, 35:4, 35:18, 35:25, 40:11, 40:12, 40:23, 40:25, 42:8, 42:16, 43:8, 43:9, 50:19, 50:20, 51:1, 51:5, 51:6, 51:7, 51:8, 51:14, 51:15, 51:17, 51:18, 51:20, 55:3, 55:4, 57:16

## E

**e.g** [1] - 41:24
**early** [1] - 36:7
**earnings** [2] - 45:3, 46:7

**economy** [1] - 6:24
**EDF** [1] - 47:17
**effect** [3] - 8:8, 20:18, 21:18
**effectuate** [1] - 42:17
**EIAP** [1] - 40:5
**EIAP's** [1] - 9:6
**either** [1] - 27:2
**elevating** [1] - 31:2
**Eligible** [1] - 9:6
**Employee** [1] - 40:2
**employee** [2] - 9:9, 17:23
**employees** [2] - 50:7
**employer** [5] - 4:2, 37:14, 37:21, 38:8, 38:10
**encourage** [2] - 9:9, 17:22
**encourages** [1] - 31:14
**end** [3] - 21:7, 33:5, 47:13
**ended** [1] - 47:14
**ends** [1] - 23:13
**ENERGY** [1] - 1:7
**Energy** [8] - 1:21, 3:6, 36:17, 38:8, 53:16, 54:8, 54:10, 61:4
**Energy's** [1] - 53:13
**Enron** [1] - 41:7
**entire** [1] - 47:11
**entirely** [1] - 5:14
**entities** [1] - 49:18
**entitled** [1] - 1:12
**entity** [1] - 50:5
**environment** [1] - 45:19
**ERISA** [27] - 1:7, 4:22, 5:3, 9:3, 14:17, 14:19, 14:25, 23:6, 30:20, 30:21, 31:3, 32:11, 32:22, 33:4, 34:25, 36:20, 40:10, 40:14, 40:15, 40:22, 40:24, 48:10, 49:22, 51:19, 51:24, 61:5
**error** [3] - 8:7, 19:12, 19:14
**escape** [1] - 41:19
**ESOP** [7] - 5:13, 7:16, 9:8, 12:4, 17:20, 40:1, 40:5
**ESP-13** [2] - 53:2, 54:4
**Esquire** [8] - 1:18, 1:19, 1:19, 1:20, 1:22, 1:23, 2:2, 2:2
**essentially** [4] - 10:8, 18:18, 28:15, 60:4
**establish** [1] - 33:4

**establishing** [1] - 32:22
**estimate** [2] - 8:7, 19:11
**ET** [2] - 1:4, 1:7
**et** [4] - 1:21, 3:6, 61:3, 61:4
**events** [4] - 58:11, 58:12, 58:14
**evidence** [2] - 58:7, 59:13
**evidentiary** [1] - 15:16
**evolving** [2] - 23:8, 25:4
**exact** [1] - 18:23
**exactly** [2] - 3:14, 57:15
**examining** [2] - 42:24, 43:4
**example** [4] - 34:4, 35:10, 40:25, 50:24
**exception** [1] - 14:21
**Exchange** [1] - 52:4
**excuse** [1] - 19:23
**exercised** [1] - 17:4
**exercising** [1] - 43:9
**Exhibit** [8] - 37:3, 42:9, 52:13, 52:18, 53:2, 53:22, 54:3
**exhibit** [2] - 52:14, 54:4
**exhibits** [1] - 53:8
**exist** [3] - 15:15, 15:21, 29:8
**existed** [1] - 19:14
**existence** [1] - 43:24
**exited** [1] - 58:20
**expected** [1] - 24:5
**explain** [1] - 59:24
**explaining** [1] - 22:22
**exposed** [2] - 34:9, 46:14
**exposure** [1] - 45:7
**expressly** [1] - 10:4
**extent** [3] - 14:3, 26:7, 51:22
**external** [1] - 58:11
**extraordinary** [16] - 5:7, 5:17, 5:24, 6:3, 6:20, 14:22, 15:4, 15:14, 15:20, 17:5, 20:8, 26:21, 27:11, 28:4, 29:7, 58:11

## F

**fact** [8] - 15:21, 16:11, 19:3, 19:6, 25:3, 27:13, 51:11, 55:15

**factors** [1] - 28:7
**facts** [12] - 4:23, 8:10, 8:20, 9:2, 15:20, 17:7, 24:9, 34:13, 48:20, 48:23, 57:2, 57:8
**factual** [6] - 4:23, 7:2, 7:22, 18:9, 35:7, 56:11
**factually** [1] - 29:16
**fail** [1] - 32:25
**failed** [3] - 33:4, 33:13, 60:3
**failing** [1] - 41:4
**fails** [1] - 32:20
**failure** [1] - 32:12
**fair** [1] - 55:7
**fairly** [1] - 27:23
**fall** [1] - 44:24
**familiar** [1] - 7:2
**far** [5] - 17:16, 43:12, 47:8, 49:22, 51:14
**fast** [4] - 21:7, 23:8, 25:4, 57:21
**fast-evolving** [2] - 23:8, 25:4
**fast-moving** [1] - 57:21
**FDIC** [1] - 57:12
**February** [1] - 36:7
**federal** [1] - 57:11
**few** [5] - 44:25, 49:8, 50:3, 51:14, 56:22
**fiduciaries** [35] - 3:14, 4:5, 6:5, 8:16, 8:19, 8:21, 10:5, 11:5, 14:1, 18:19, 19:7, 19:13, 20:24, 24:18, 24:21, 25:13, 27:13, 29:5, 30:5, 31:3, 32:13, 42:23, 43:3, 43:8, 44:15, 44:19, 46:11, 46:14, 48:10, 49:6, 49:8, 49:23, 56:13, 57:20, 57:22
**fiduciaries'** [1] - 49:7
**fiduciary** [75] - 5:8, 5:13, 5:25, 6:1, 6:16, 10:15, 10:24, 12:1, 13:11, 14:2, 14:4, 14:12, 14:13, 14:17, 14:23, 15:2, 15:14, 16:8, 16:9, 16:18, 16:20, 16:24, 17:9, 19:20, 20:6, 21:13, 22:10, 23:2, 23:7, 24:1, 25:20, 26:12, 26:23, 26:25, 27:4, 27:9, 29:1, 29:10, 30:20, 30:21, 32:11,

32:15, 32:17, 32:18, 32:22, 33:1, 37:23, 38:16, 39:6, 39:7, 40:11, 41:11, 41:19, 41:21, 41:22, 42:20, 44:9, 50:3, 50:22, 51:9, 51:11, 51:12, 51:18, 51:25, 52:7, 55:6, 55:20, 55:24, 56:15, 57:16, 58:13, 59:20, 59:23, 59:24
**Fifth** [2] - 15:25, 29:17
**fifth** [1] - 32:8
**filed** [3] - 37:2, 53:16, 57:14
**filing** [1] - 42:12
**filings** [10] - 30:11, 30:19, 31:7, 31:8, 31:15, 52:3, 52:4, 52:15, 53:6
**final** [1] - 38:20
**fine** [2] - 30:2, 56:21
**finish** [1] - 20:22
**finished** [1] - 56:4
**first** [13] - 12:4, 12:24, 17:15, 18:10, 20:13, 20:14, 23:21, 30:9, 31:22, 36:23, 41:8, 58:2, 58:10
**fiscal** [1] - 53:14
**five** [3] - 18:13, 18:17, 47:16
**flow** [1] - 15:13
**focus** [7] - 3:16, 8:1, 15:8, 22:17, 33:10, 45:21, 47:15
**focused** [1] - 48:7
**follow** [1] - 14:17
**following** [6] - 11:11, 12:22, 18:24, 32:4, 34:3, 41:12
**footnote** [1] - 56:10
**FOR** [1] - 1:2
**forecasted** [1] - 46:12
**foregoing** [1] - 61:2
**foresight** [1] - 23:3
**forever** [1] - 54:16
**form** [2] - 31:2, 47:19
**forward** [3] - 21:7, 22:4, 24:4, 30:7
**Fourth** [7] - 28:22, 29:20, 30:21, 33:17, 35:4, 51:17, 56:8
**fourth** [2] - 53:15, 53:21
**frame** [1] - 24:2
**framework** [1] - 4:25
**frankly** [1] - 33:5
**fraud** [1] - 25:12
**freezing** [1] - 24:6

**frequently** [1] - 10:12
**Friday** [1] - 22:19
**front** [1] - 53:2
**function** [7] - 10:11,
26:20, 30:19, 30:20,
54:19, 54:21
**fund** [8] - 3:23, 3:25,
4:3, 7:10, 11:13,
13:16, 39:18, 44:1
**Fund** [18] - 9:8, 9:16,
9:24, 9:25, 11:3,
11:4, 11:12, 11:13,
11:17, 11:18, 12:2,
12:14, 13:12, 43:19,
43:21, 43:24, 46:4,
54:15
**fundamental** [2] -
20:1, 45:24
**fundamentally** [1] -
30:17
**Funds** [1] - 42:1
**funds** [11] - 7:12, 9:25,
11:12, 11:19, 11:21,
11:22, 11:23, 12:3,
12:15, 38:19
**furthermore** [1] - 6:9
**future** [10] - 6:7, 8:12,
19:8, 19:9, 21:14,
22:15, 22:16, 23:8,
58:23, 60:1

**G**

**Gail** [2] - 1:25, 61:10
**general** [1] - 23:12
**generalities** [1] -
30:13
**generated** [1] - 19:2
**generically** [1] - 10:14
**GILLESPIE** [3] -
31:21, 32:3, 60:11
**Gillespie** [3] - 1:22,
4:13, 60:9
**given** [1] - 54:10
**government** [2] -
22:13, 59:3
**grant** [1] - 10:5
**granted** [1] - 28:21
**grossly** [1] - 50:25
**GROUP** [1] - 1:7
**Group** [8] - 1:21, 3:6,
38:8, 39:22, 53:16,
54:8, 54:10, 61:4
**guess** [6] - 3:23, 26:1,
27:16, 35:21, 35:22,
42:13
**Guiney** [1] - 1:19

**H**

**hand** [3] - 9:1, 9:2,
37:11
**happy** [1] - 4:7
**hard** [2] - 44:9, 45:18
**Harmon** [2] - 41:8,
41:10
**HAY** [1] - 1:4
**hays** [1] - 18:11
**Hays** [1] - 3:5
**hear** [2] - 4:7, 31:22
**heard** [1] - 4:21
**hearing** [2] - 1:13, 3:7
**held** [2] - 42:7, 48:1
**help** [2] - 3:12, 45:1
**helpful** [1] - 60:19
**hereby** [2] - 53:24,
61:2
**high** [1] - 35:10
**high-ranking** [1] -
35:10
**highest** [1] - 36:9
**highs** [1] - 21:4
**hold** [1] - 16:18
**holding** [1] - 42:14
**honest** [1] - 11:20
**Honor** [25] - 3:10, 4:9,
4:20, 10:25, 14:11,
15:12, 17:14, 18:24,
24:17, 28:14, 31:19,
31:21, 32:3, 32:7,
32:19, 34:2, 34:17,
34:20, 35:23, 40:8,
46:13, 56:22, 60:8,
60:11, 60:13
**Honorable** [2] - 1:13,
61:6
**horns** [1] - 17:3
**hours** [1] - 10:1
**hum** [1] - 55:17

**I**

**Ian** [1] - 2:2
**idea** [3] - 15:13, 19:14,
25:22
**identified** [1] - 30:15
**identify** [2] - 34:14,
44:13
**II** [1] - 32:12
**III** [1] - 32:13
**illegal** [1] - 25:11
**immediately** [3] -
9:20, 19:18, 24:10
**imminent** [1] - 6:11
**impact** [1] - 22:17
**impartially** [1] - 55:24

**impending** [2] - 48:7,
59:14
**import** [1] - 39:5
**important** [6] - 5:19,
7:19, 9:20, 10:7,
10:17, 25:18, 26:23,
57:5
**impose** [1] - 7:13
**imposed** [1] - 42:8
**imposes** [1] - 51:24
**improper** [1] - 18:11
**imprudent** [7] - 7:18,
8:5, 18:11, 18:21,
41:13, 41:24, 59:20
**imputed** [1] - 50:10
**IN** [1] - 1:1
**inaccurate** [1] - 30:10
**inadequate** [1] - 49:1
**inappropriate** [1] -
59:20
**INC** [1] - 1:7
**Inc** [3] - 1:21, 3:6, 61:4
**inclined** [1] - 24:8
**include** [1] - 11:22
**includes** [1] - 38:9
**including** [2] - 38:10,
39:8
**Income** [5] - 9:25,
11:4, 11:13, 11:18,
12:14
**income** [1] - 40:16
**inconsistent** [1] -
40:22
**incorporate** [1] - 31:7
**incorporated** [6] -
30:25, 31:10, 31:12,
52:3, 52:16, 53:7
**incorporating** [2] -
52:6, 53:9
**incorporation** [1] -
53:4
**increase** [2] - 21:22,
58:19
**increasing** [1] - 22:1
**independent** [1] - 33:8
**indicate** [3] - 17:15,
45:24, 54:14
**indicates** [1] - 47:3
**indication** [2] - 19:22,
19:25, 21:15
**individual** [2] - 4:10,
32:10
**Individual** [2] - 2:1,
9:6
**individuals** [1] - 51:21
**inflated** [1] - 46:18
**inflation** [1] - 48:12
**influence** [1] - 12:19
**information** [6] -
25:20, 30:6, 50:22,

51:1, 51:16, 58:3
**inherent** [1] - 35:21
**initial** [1] - 44:6
**inside** [2] - 26:4, 47:23
**insolvency** [1] - 47:9
**instance** [2] - 5:20,
17:19
**instead** [2] - 5:6,
25:24
**instrument** [1] - 36:22
**insufficient** [1] - 35:6
**Interest** [5] - 9:24,
11:3, 11:13, 11:18,
12:14
**interest** [7] - 32:14,
33:12, 33:19, 35:4,
35:18, 47:16, 51:8
**interests** [1] - 41:24
**internal** [2] - 58:12,
58:14
**interpret** [2] - 12:20,
27:16
**interpreted** [1] - 27:22
**interpreting** [1] - 7:12
**interrupt** [1] - 55:16
**intervene** [1] - 59:11
**invest** [5] - 5:22, 13:5,
13:8, 13:15, 13:18
**invested** [13] - 9:18,
9:19, 11:3, 12:6,
12:22, 12:24, 13:22,
18:6, 27:24, 39:18,
39:22, 43:18, 46:3
**investigate** [1] - 29:12
**investigated** [1] -
55:25
**investigation** [5] -
27:14, 29:4, 29:6,
55:10, 55:12
**Investment** [9] -
11:14, 11:19, 12:17,
14:5, 14:8, 49:11,
49:17, 50:12, 51:2
**investment** [25] - 7:18,
8:5, 11:12, 11:13,
11:19, 11:21, 11:22,
11:23, 12:3, 12:15,
18:21, 20:10, 26:16,
28:12, 37:15, 38:17,
38:19, 39:6, 39:8,
41:11, 42:6, 49:13,
50:16, 56:14
**investments** [3] -
7:11, 11:2, 30:23
**involved** [2] - 12:9,
18:25
**ironic** [1] - 58:17
**issue** [4] - 14:11, 31:6,
45:1, 56:9
**issued** [1] - 22:21

**items** [1] - 18:14
**itself** [9] - 19:5, 34:9,
42:14, 43:13, 48:14,
49:23, 50:1, 55:5,
55:23
**IV** [2] - 32:14, 51:12

**J**

**James** [5] - 1:18, 1:22,
2:2, 34:21, 34:24
**January** [6] - 20:24,
21:11, 44:14, 44:21,
60:4
**Jim** [1] - 4:9
**jitters** [1] - 21:25
**job** [1] - 50:23
**Johnson** [1] - 1:20
**judge** [1] - 41:8
**Judge** [3] - 1:14,
41:10, 61:7
**judgment** [3] - 28:18,
28:20, 28:22
**Julie** [1] - 1:20
**July** [1] - 21:7
**jump** [2] - 29:25,
44:25
**June** [2] - 1:10, 61:7

**K**

**Karen** [1] - 1:23
**keep** [1] - 59:7
**keeping** [1] - 5:24
**Keller** [2] - 34:21,
34:25
**key** [1] - 50:18
**Kilgard** [1] - 1:19
**kind** [10] - 5:25, 6:2,
18:11, 20:8, 25:11,
27:7, 30:12, 55:15,
57:15, 57:16
**Kirschbaum** [4] -
29:16, 29:18, 29:19,
29:22
**knowing** [4] - 8:25,
22:8, 47:22, 51:10
**knowledge** [15] - 6:5,
6:10, 8:21, 23:3,
23:22, 25:5, 25:10,
26:4, 26:7, 46:20,
48:6, 48:12, 50:10,
57:3, 59:14
**known** [12] - 6:6, 8:3,
8:21, 18:19, 21:13,
22:11, 22:13, 25:12,
26:5, 44:20, 46:23,
59:14
**knows** [1] - 50:24

## L

**lack** [3] - 23:21, 48:25, 55:9
**lacking** [1] - 35:9
**laid** [1] - 40:10
**language** [14] - 3:17, 4:4, 17:12, 17:25, 18:4, 37:19, 38:12, 40:3, 43:5, 43:15, 53:4, 54:13, 54:20, 55:1
**last** [9] - 16:2, 36:23, 42:13, 49:4, 54:2, 55:2, 56:5, 58:6
**latest** [1] - 53:14
**laundry** [1] - 34:5
**law** [7] - 15:18, 30:18, 50:9, 57:5, 57:6, 57:7, 57:8
**laws** [2] - 5:3, 31:5
**lay** [1] - 52:11
**lead** [3] - 8:4, 20:8, 26:12
**least** [5] - 6:12, 18:3, 50:10, 52:22, 53:8
**leave** [1] - 12:1
**led** [1] - 19:7
**legal** [3] - 7:15, 7:20, 28:10
**Lehman** [14] - 8:8, 20:17, 20:22, 22:8, 22:12, 22:14, 22:23, 24:5, 34:10, 34:15, 45:4, 45:17, 46:8, 59:1
**length** [2] - 34:11, 36:3
**liability** [3] - 32:15, 32:17, 41:19
**liable** [4] - 14:12, 41:4, 41:23, 56:13
**light** [4] - 45:1, 48:11, 58:20
**limitation** [2] - 17:21, 43:17
**limited** [3] - 14:5, 40:13
**line** [1] - 20:22
**liquid** [1] - 45:20
**liquidity** [6] - 20:4, 21:23, 45:12, 47:18, 58:19, 59:8
**list** [2] - 18:13, 34:5
**listed** [1] - 18:13
**literally** [1] - 20:23
**Litigation** [1] - 61:5
**LITIGATION** [1] - 1:7
**lived** [1] - 25:24

**loan** [1] - 49:1
**locate** [1] - 40:3
**Loeser** [1] - 37:3
**look** [21] - 8:10, 16:6, 18:1, 24:7, 27:13, 28:5, 28:7, 28:10, 29:10, 29:15, 30:25, 40:9, 40:23, 42:21, 44:23, 47:25, 48:20, 55:6, 55:8, 55:19, 55:22
**looked** [4] - 4:6, 26:1, 27:21, 29:18
**looking** [16] - 3:12, 11:7, 11:8, 19:20, 20:6, 24:1, 24:8, 25:25, 27:15, 28:15, 28:23, 35:17, 36:12, 57:20, 58:19, 58:24
**looks** [1] - 11:1
**loss** [2] - 46:5, 49:1
**losses** [2] - 46:1, 46:2
**lost** [2] - 57:10, 60:17
**louder** [1] - 55:17
**loyalty** [6] - 4:11, 26:13, 30:1, 30:3, 31:18, 51:15

## M

**maintain** [2] - 26:16, 28:13
**manage** [1] - 47:7
**managed** [1] - 56:11
**management** [1] - 48:25
**manner** [1] - 45:8
**march** [1] - 57:15
**market** [18] - 4:25, 6:23, 8:19, 21:25, 22:7, 22:8, 22:24, 22:25, 23:1, 23:4, 23:12, 24:6, 25:20, 25:25, 57:23, 57:25, 58:24
**markets** [4] - 45:20, 58:4, 58:20, 59:4
**MARYLAND** [1] - 1:2
**Maryland** [1] - 1:9
**match** [3] - 9:14, 9:18, 38:14
**matching** [10] - 4:2, 9:12, 10:9, 12:5, 18:5, 39:17, 39:21, 41:9, 43:22
**material** [2] - 30:15, 51:16
**materialized** [1] - 47:5
**materially** [1] - 30:10

**Mathias** [6] - 2:2, 3:9, 4:9, 33:3, 34:4, 54:18
**MATHIAS** [29] - 3:10, 4:9, 4:13, 4:18, 7:6, 7:15, 10:21, 11:10, 11:16, 12:4, 12:8, 12:11, 12:23, 13:5, 13:8, 13:20, 14:10, 16:14, 17:14, 20:13, 26:17, 28:14, 28:19, 28:23, 29:21, 30:3, 52:23, 56:22, 57:1
**Mathias's** [1] - 34:3
**matter** [10] - 3:7, 8:20, 8:22, 8:24, 30:24, 33:5, 54:24, 56:11, 57:2, 61:3
**matters** [4] - 4:15, 57:2, 57:3, 58:17
**Matthew** [1] - 1:19
**McCartan** [1] - 1:23
**mean** [14] - 11:6, 21:15, 27:17, 28:2, 35:20, 39:14, 39:16, 43:4, 44:14, 46:5, 48:17, 48:22, 53:8, 59:22
**means** [2] - 12:11, 32:1
**meltdown** [3] - 4:25, 21:5, 22:3
**members** [1] - 14:6
**members'** [1] - 48:8
**memory** [1] - 52:5
**mentioned** [2] - 15:4, 18:16
**mentioning** [1] - 35:2
**mere** [3] - 19:3, 33:18, 35:6
**merely** [1] - 41:20
**merit** [1] - 31:18
**merits** [1] - 55:8
**microphone** [1] - 56:24
**middle** [1] - 26:9
**might** [4] - 14:20, 24:13, 35:15, 59:5
**mike** [1] - 34:23
**Mile** [15] - 3:19, 4:14, 9:6, 17:13, 32:6, 32:10, 39:13, 39:14, 40:3, 42:25, 43:10, 49:19, 49:20, 49:23, 52:18
**mind** [2] - 56:23, 59:7
**minutes** [1] - 47:1
**misleading** [1] - 30:10
**mismanagement** [1] - 18:11

**mismanaging** [1] - 8:2
**misrepresentation** [1] - 30:15
**misrepresentations** [1] - 30:5
**mistake** [5] - 19:15, 19:21, 19:23, 20:2, 21:20
**model** [5] - 8:2, 8:4, 18:23, 19:4, 46:15
**modify** [1] - 54:9
**Moench** [6] - 6:15, 15:10, 15:11, 15:12, 15:23, 16:4, 16:14, 16:17, 17:7, 17:11, 17:23, 18:8, 25:9, 27:8, 27:10, 27:15, 27:19, 27:23, 28:2, 28:14, 29:2, 29:3, 42:14, 42:15, 48:1, 48:2, 48:13, 48:14, 48:19, 48:23, 49:5, 55:22, 55:23, 56:2, 57:9, 58:12
**Monday** [1] - 22:20
**money** [5] - 11:2, 13:2, 13:21, 44:2, 60:17
**monitor** [4] - 32:13, 50:19, 50:20, 51:6
**monitoring** [1] - 50:22
**month** [1] - 25:1
**months** [2] - 21:5, 21:9
**moreover** [1] - 41:11
**Morgan** [1] - 42:1
**morning** [4] - 4:22, 32:5, 34:12, 34:16
**most** [3] - 6:9, 6:21, 17:5
**motion** [4] - 15:24, 18:16, 41:2, 55:13
**motions** [4] - 1:12, 3:7, 8:1, 10:13
**move** [5] - 9:22, 24:4, 24:10, 34:22, 38:20, 42:13
**moving** [1] - 57:21
**MR** [79] - 3:10, 4:9, 4:13, 4:18, 7:6, 7:15, 10:21, 11:10, 11:16, 12:4, 12:8, 12:11, 12:23, 13:5, 13:8, 13:20, 14:10, 16:14, 17:14, 20:13, 26:17, 28:14, 28:19, 28:23, 29:21, 30:3, 31:21, 32:1, 32:3, 34:20, 34:24, 35:23, 36:8, 36:12, 36:15, 36:19, 37:2, 37:8, 37:11,

**Mathias** (continued)

37:14, 37:19, 38:3, 38:7, 38:25, 39:10, 39:23, 39:25, 40:7, 42:23, 43:6, 43:8, 43:23, 44:1, 44:17, 46:9, 46:13, 47:25, 48:22, 50:1, 52:14, 52:17, 52:20, 52:23, 52:24, 53:1, 53:10, 53:21, 53:25, 54:2, 54:7, 54:13, 54:20, 55:19, 56:4, 56:8, 56:22, 57:1, 60:11, 60:13
**must** [4] - 40:19, 41:12, 42:20, 43:18
**mutual** [1] - 9:25
**Mutual** [1] - 42:1

## N

**name** [2] - 34:20, 49:21
**named** [3] - 49:23, 50:14, 51:25
**narrow** [1] - 14:21
**nature** [2] - 5:24, 19:10
**near** [3] - 21:4, 36:8, 45:23
**near-term** [1] - 45:23
**necessary** [1] - 50:22
**need** [8] - 6:2, 6:4, 6:9, 6:12, 13:5, 30:16, 55:16, 55:18
**needed** [3] - 45:12, 47:6, 47:18
**never** [2] - 25:19, 41:5
**nevertheless** [3] - 42:7, 42:21, 47:13
**new** [2] - 45:19, 53:6
**New** [2] - 29:24, 42:3
**news** [1] - 5:4
**next** [7] - 15:9, 16:25, 17:1, 21:16, 23:23, 25:22, 37:12
**nine** [1] - 21:5
**Nine** [15] - 3:19, 4:14, 9:6, 17:13, 32:6, 32:10, 39:13, 39:14, 40:3, 42:25, 43:9, 49:18, 49:20, 49:23, 52:18
**Ninth** [1] - 15:25
**NMP** [1] - 18:1
**NO** [1] - 1:6
**non** [2] - 32:18, 51:11
**non-fiduciary** [2] - 32:18, 51:11

**normal** [1] - 58:6
**note** [1] - 34:2
**noted** [2] - 34:4, 39:25
**notes** [1] - 38:25
**nothing** [7] - 22:1, 25:17, 26:5, 31:13, 59:10, 60:11, 60:13
**notice** [3] - 10:2, 10:12, 36:23
**notion** [1] - 18:10
**number** [8] - 5:1, 6:14, 22:11, 22:12, 22:15, 50:21, 54:4
**Number** [1] - 3:5
**numbered** [1] - 52:21
**numerous** [1] - 40:17

**O**

**obey** [1] - 40:11
**obligation** [8] - 6:8, 7:13, 8:18, 20:25, 23:7, 44:16, 44:18, 44:22
**obligations** [1] - 4:4
**obtain** [1] - 47:6
**obvious** [1] - 44:8
**obviously** [5] - 3:17, 44:8, 44:17, 46:5, 57:5
**occurred** [2] - 8:23, 8:24
**October** [3] - 20:5, 59:9, 59:11
**OF** [1] - 1:2
**offer** [6] - 3:25, 27:2, 27:3, 41:3, 47:10, 59:21
**offered** [9] - 5:9, 9:8, 13:10, 14:15, 14:23, 18:4, 43:16, 44:2, 53:24
**offering** [3] - 17:17, 53:19, 53:24
**offerings** [4] - 5:22, 9:23, 11:4, 12:12
**offers** [2] - 24:3, 24:20
**officer** [1] - 33:18
**officers** [3] - 35:22, 48:10, 50:11
**Official** [2] - 1:25, 61:11
**officials** [1] - 35:11
**often** [1] - 52:1
**one** [30] - 7:4, 7:18, 9:1, 9:22, 11:11, 12:19, 12:22, 13:8, 18:10, 22:11, 23:15, 24:3, 24:12, 24:13,

24:15, 28:7, 29:15, 34:2, 35:1, 36:19, 38:20, 42:13, 43:14, 49:4, 50:21, 54:2, 55:2, 55:4, 56:16
**ones** [1] - 50:15
**opening** [1] - 33:23
**opens** [1] - 22:8
**opinion** [1] - 56:10
**oppose** [1] - 41:2
**opposed** [2] - 37:22, 58:4
**opposition** [2] - 32:25, 33:24
**option** [5] - 3:25, 7:10, 10:6, 43:16, 50:16
**options** [10] - 4:6, 13:17, 16:10, 37:15, 38:14, 38:17, 39:8, 49:13, 55:25, 56:14
**oral** [1] - 53:12
**order** [1] - 5:9
**oriented** [1] - 45:14
**originally** [1] - 52:8
**otherwise** [1] - 15:22
**ought** [3] - 16:15, 17:24, 31:3
**outcome** [1] - 57:7
**outset** [1] - 57:1
**outside** [6] - 26:14, 27:7, 28:9, 28:10, 46:25
**outsmart** [1] - 8:19
**outward** [1] - 46:22
**overall** [2] - 6:24, 9:23
**overarching** [1] - 32:19
**overcome** [4] - 17:7, 25:9, 27:11, 29:3
**overcoming** [1] - 18:8
**overexposed** [1] - 30:12
**overvalued** [2] - 50:25
**overview** [1] - 4:19
**own** [1] - 13:2
**Ownership** [1] - 40:2
**ownership** [2] - 9:9, 17:23

**P**

**page** [26] - 11:7, 18:17, 32:24, 34:8, 37:1, 37:5, 37:8, 37:25, 38:2, 38:3, 38:4, 38:22, 39:19, 41:2, 48:2, 48:24, 52:14, 52:20, 52:22, 52:23, 52:24, 53:2,

53:22, 54:4
**pages** [1] - 52:21
**papers** [5] - 8:1, 10:12, 10:13, 31:1, 33:9
**paragraph** [9] - 18:14, 34:4, 34:8, 35:12, 35:13, 36:24, 45:16, 47:14, 55:12
**paragraphs** [3] - 18:15, 36:13, 45:8
**part** [2] - 30:4, 52:10
**participant** [2] - 7:10, 9:21, 13:15
**participant's** [1] - 44:2
**participants** [7] - 4:1, 5:20, 9:12, 10:2, 13:1, 52:9
**participants'** [2] - 5:18, 41:23
**participate** [1] - 54:15
**participating** [1] - 32:17
**participation** [1] - 51:10
**particular** [6] - 5:14, 37:5, 37:8, 44:19, 53:8, 55:20
**pass** [1] - 51:1
**past** [2] - 42:21, 59:25
**PDF** [3] - 38:3, 38:22, 52:14
**pending** [1] - 3:4
**people** [9] - 13:17, 31:14, 45:10, 46:3, 46:6, 48:9, 49:16, 57:6, 60:17
**per** [1] - 47:21
**percent** [2] - 47:16, 57:10
**performance** [4] - 8:12, 33:20, 59:25, 60:1
**perhaps** [2] - 4:15, 42:25
**Period** [2] - 20:20, 36:10, 44:21
**period** [4] - 21:9, 21:19, 48:19, 57:9
**permits** [1] - 17:17
**permitted** [1] - 27:19
**phrased** [1] - 42:16
**picked** [1] - 11:4
**picking** [1] - 38:17
**place** [2] - 4:24, 23:15
**plain** [1] - 42:11
**plaintiff** [1] - 48:4
**PLAINTIFFS** [1] - 1:5
**plaintiffs** [22] - 6:1, 6:9, 7:1, 7:25, 8:15,

10:13, 10:22, 15:19, 16:4, 19:6, 20:21, 20:23, 24:13, 32:9, 32:24, 33:3, 33:16, 34:25, 41:3, 41:6, 41:15, 49:10
**Plaintiffs** [2] - 1:17, 61:3
**plaintiffs'** [6] - 3:20, 23:19, 31:24, 34:5, 42:2, 59:18
**plan** [5] - 10:19, 13:1, 20:2, 39:13, 46:3
**Plan** [89] - 4:4, 5:8, 5:10, 5:17, 5:20, 9:5, 9:6, 10:2, 10:6, 10:9, 10:11, 10:17, 10:18, 10:25, 11:1, 11:4, 11:7, 11:8, 11:16, 12:21, 12:23, 12:25, 13:1, 13:14, 14:6, 14:18, 14:23, 15:3, 15:22, 16:12, 17:13, 17:16, 17:17, 18:1, 19:9, 20:25, 21:18, 26:20, 27:22, 30:22, 30:23, 31:6, 31:9, 31:11, 31:13, 31:15, 36:20, 38:10, 39:1, 39:2, 39:6, 39:13, 39:14, 39:16, 39:20, 40:1, 40:2, 40:3, 40:11, 40:14, 40:19, 40:21, 40:23, 41:12, 41:20, 42:6, 42:25, 43:1, 43:10, 43:12, 43:13, 43:23, 44:12, 49:9, 49:12, 49:20, 49:21, 49:24, 50:2, 51:23, 51:25, 52:2, 52:10, 53:1, 56:13
**Plan's** [1] - 41:22
**Plans** [13] - 9:5, 9:7, 9:8, 9:11, 9:16, 9:17, 9:23, 10:4, 17:19, 18:1, 43:5
**plans** [3] - 3:17, 26:8, 39:12
**plants** [1] - 47:17
**plausible** [1] - 60:5
**play** [1] - 57:17
**plead** [2] - 15:19, 32:9
**pleading** [2] - 59:22, 60:3
**pled** [2] - 29:14, 33:22
**point** [46] - 3:21, 5:15, 5:19, 5:21, 6:17, 7:19, 8:6, 8:7, 9:20, 10:7, 13:20, 16:16, 16:17, 19:13, 21:13,

21:15, 23:20, 24:23, 25:19, 28:6, 28:8, 29:7, 29:9, 31:2, 32:19, 34:2, 41:7, 41:16, 42:13, 44:10, 44:14, 45:10, 47:19, 49:20, 50:18, 53:15, 53:21, 54:2, 54:20, 54:23, 55:2, 56:5, 58:1, 58:18, 59:6, 59:23
**pointed** [4] - 7:1, 16:5, 26:7, 43:14
**pointing** [1] - 41:20
**points** [5] - 30:8, 34:3, 51:14, 53:11, 59:17
**portfolio** [2] - 5:22, 10:3
**portfolios** [1] - 5:18
**position** [2] - 15:1, 28:11
**possible** [3] - 6:18, 26:13, 54:25
**post** [1] - 28:16
**power** [3] - 15:2, 15:14, 47:17
**practices** [1] - 49:1
**pre** [1] - 36:2
**pre-discovery** [1] - 36:2
**precipitous** [3] - 6:3, 21:11, 48:5
**precisely** [1] - 48:4
**predates** [1] - 51:18
**predict** [8] - 19:7, 21:5, 22:2, 22:15, 22:16, 23:8, 24:5, 58:23
**predicted** [1] - 57:25
**preexisting** [1] - 23:3
**prelude** [1] - 9:4
**presentation** [1] - 34:18
**presumption** [24] - 6:15, 15:10, 15:11, 15:12, 15:17, 15:23, 16:4, 16:14, 16:17, 17:8, 17:11, 17:24, 18:9, 25:9, 27:9, 27:10, 27:20, 29:2, 29:3, 40:5, 42:15, 48:2, 48:13, 55:23
**presuppose** [1] - 17:19
**presupposes** [2] - 12:8, 18:3
**pretty** [4] - 18:2, 25:22, 29:22, 47:8
**prevail** [1] - 39:4
**previewed** [1] - 32:7

**Price** [1] - 36:16
**price** [9] - 6:2, 6:4,
6:6, 6:12, 16:23,
21:21, 21:24, 36:9,
46:18
**prices** [1] - 45:20
**primarily** [1] - 41:10
**primary** [4] - 33:1,
33:4, 33:10, 44:11
**principal** [1] - 34:6
**principles** [2] - 7:20,
50:9
**prioritize** [1] - 45:22
**problem** [2] - 26:15,
56:17
**problems** [3] - 23:18,
26:3, 34:10
**proceedings** [1] -
60:21
**process** [3] - 19:16,
47:14, 55:15
**producing** [1] - 51:24
**profit** [1] - 45:14
**profit-oriented** [1] -
45:14
**profits** [1] - 45:23
**proper** [1] - 25:3
**proposed** [1] - 40:18
**prospectus** [5] - 31:6,
31:8, 31:10, 52:16,
53:18
**protect** [2] - 40:15,
54:11
**protects** [1] - 6:16
**protocol** [1] - 32:4
**provide** [1] - 50:21
**provided** [1] - 37:16
**provision** [1] - 38:21
**provisions** [8] - 39:2,
39:3, 40:17, 40:20,
40:22, 40:24
**prudence** [19] - 4:11,
5:3, 14:13, 19:5,
23:6, 23:20, 27:21,
34:6, 40:6, 40:25,
42:8, 42:24, 43:1,
43:4, 48:2, 50:15,
54:24, 55:5, 55:19
**prudent** [4] - 3:22,
14:24, 20:9, 55:5
**public** [1] - 46:22
**purchase** [1] - 54:9
**purely** [3] - 50:19,
51:6, 51:9
**purported** [1] - 33:14
**purpose** [3] - 9:9,
27:8, 44:11
**purposes** [2] - 40:5,
42:17
**pursuant** [2] - 36:21,

53:16
**pushed** [1] - 47:8
**put** [4] - 6:1, 13:1,
13:2, 36:15

# Q

**quality** [1] - 48:25
**quarterly** [1] - 31:7
**questions** [5] - 4:20,
30:1, 34:18, 44:7,
56:19
**quick** [1] - 16:19
**quickly** [1] - 35:1
**quite** [5] - 9:3, 27:16,
33:5, 38:14, 44:17
**quoted** [1] - 37:19

# R

**radical** [1] - 5:17
**raised** [2] - 10:22,
33:23
**ranking** [1] - 35:10
**rate** [1] - 23:16
**rating** [1] - 23:12
**re** [2] - 42:1, 52:11
**react** [1] - 6:17
**reacted** [1] - 20:2,
58:15
**reacting** [3] - 8:13,
9:1, 23:4
**read** [1] - 31:15
**reading** [4] - 28:1,
38:14, 38:16, 47:1
**reads** [1] - 37:14
**reality** [1] - 16:18
**realization** [1] - 45:23
**really** [19] - 8:24,
15:13, 15:16, 16:14,
16:23, 25:15, 28:11,
30:4, 30:8, 30:14,
44:14, 44:25, 47:8,
50:20, 56:9, 57:2,
57:7, 59:15, 60:7
**reason** [3] - 16:16,
27:5, 58:14
**reasonable** [2] -
58:25, 59:10
**reasonably** [1] - 60:20
**reasons** [4] - 5:2,
30:13, 31:17, 34:11
**rebut** [2] - 48:1, 48:13
**rebutted** [1] - 42:15
**receive** [1] - 53:11
**recognize** [1] - 15:10
**recognized** [1] - 35:5
**recognizing** [1] - 27:9

**record** [1] - 28:24
**reduce** [2] - 45:6,
45:18
**reduction** [1] - 45:23
**refer** [1] - 10:13
**reference** [1] - 52:16
**refers** [2] - 37:21
**reflect** [1] - 35:15
**reflects** [2] - 16:18,
19:22
**regard** [8] - 6:19, 10:9,
13:25, 15:16, 16:10,
18:8, 19:11, 29:15
**regarding** [1] - 41:18
**regardless** [1] - 56:17
**regulation** [1] - 56:12
**regulators** [1] - 57:11
**regulatory** [1] - 57:12
**related** [1] - 59:17
**relationship** [1] -
22:22
**reliability** [1] - 25:14
**remain** [1] - 35:14
**remained** [1] - 8:12
**remember** [1] - 12:25
**remembering** [1] -
36:5
**remove** [3] - 10:5,
10:24, 51:5
**removed** [1] - 10:10
**repeated** [2] - 18:12,
18:16
**reply** [5] - 37:20,
38:12, 41:1, 56:21
**Report** [1] - 53:13
**Reporter** [2] - 1:25,
61:11
**REPORTER'S** [1] -
61:1
**reports** [1] - 53:14
**represents** [1] - 4:13
**request** [1] - 53:12
**requesting** [1] - 7:12
**require** [1] - 31:6
**required** [5] - 14:17,
27:19, 36:20, 37:17,
42:6
**requirement** [2] -
51:24, 59:21
**requirements** [2] -
45:19, 56:12
**requiring** [1] - 41:20
**reserves** [1] - 49:2
**resolved** [1] - 23:10
**response** [5] - 37:4,
37:20, 39:19, 41:15,
59:18
**responsibilities** [2] -
48:9, 49:7

**responsibility** [2] -
49:13, 50:6
**responsible** [3] -
30:22, 50:16, 52:1
**responsive** [1] - 36:12
**rest** [2] - 14:18, 57:23
**retirement** [2] - 40:16,
46:3
**reversed** [1] - 28:20
**reverses** [1] - 54:8
**review** [1] - 33:8
**reviewed** [1] - 33:3
**rewards** [1] - 19:2
**rewrite** [1] - 10:8
**ridiculous** [1] - 21:2
**Riggs** [1] - 51:17
**rights** [1] - 54:9
**rises** [1] - 17:1
**risk** [5] - 45:22, 46:16,
47:4, 47:5, 58:22
**risks** [4] - 18:25, 19:1,
45:18
**risky** [5] - 8:2, 8:3,
18:21, 30:12, 45:13
**road** [1] - 47:8
**rocky** [2] - 58:5, 58:20
**Rohrback** [2] - 34:21,
34:25
**Ron** [1] - 1:19
**Ronald** [2] - 3:5, 61:3
**RONALD** [1] - 1:4
**Rowe** [1] - 36:16
**RPR** [1] - 1:25
**rule** [1] - 14:16
**ruled** [4] - 41:10, 48:3,
48:12, 56:10
**rules** [1] - 59:22
**ruling** [3] - 41:18,
41:25, 42:4

# S

**sale** [3] - 36:4, 36:6,
54:9
**satisfy** [2] - 35:25,
56:11
**scarce** [1] - 45:21
**schedules** [1] - 40:18
**screen** [2] - 36:15,
37:12
**se** [1] - 47:21
**seated** [1] - 3:3
**SEC** [8] - 30:11, 30:18,
31:4, 31:7, 31:15,
52:3, 52:15, 53:6
**second** [9] - 7:4, 14:3,
19:12, 23:23, 32:7,
42:2, 42:9, 42:12,
55:17

**Second** [1] - 37:6
**Section** [4] - 11:7,
40:9, 43:15, 51:24
**section** [2] - 11:20,
14:16
**sections** [1] - 53:17
**secured** [1] - 20:4
**Securities** [2] - 52:4,
53:17
**securities** [5] - 4:21,
7:3, 31:5, 34:15,
53:24
**security** [2] - 40:16,
45:13
**see** [8] - 3:2, 20:7,
23:16, 25:5, 36:13,
37:1, 37:11, 37:25
**seem** [1] - 38:14
**seized** [1] - 58:4
**select** [1] - 39:7
**selected** [3] - 11:14,
11:19, 12:15
**selecting** [1] - 49:13
**selection** [1] - 56:13
**selections** [1] - 13:22
**sell** [3] - 7:14, 44:16,
47:21
**selling** [3] - 26:11,
35:14, 47:16
**sense** [3] - 21:6, 49:5,
50:7
**sentence** [2] - 36:23,
37:14
**September** [9] - 8:8,
22:5, 22:6, 22:7,
22:19, 22:20, 23:11,
25:1, 58:10
**serves** [1] - 52:5
**set** [3] - 3:7, 13:14,
26:19
**sets** [2] - 49:8, 56:15
**settlor** [7] - 10:11,
10:16, 10:18, 12:18,
13:14, 26:19, 37:22
**settlor's** [2] - 26:20,
54:19
**settlors** [1] - 13:10
**seven** [6] - 10:1,
18:14, 21:9, 34:5,
34:8, 58:6
**Seventh** [1] - 15:25
**several** [3] - 16:2,
18:12, 18:14
**shall** [3] - 9:18, 12:6,
39:4
**shape** [1] - 22:4
**share** [8] - 7:18,
19:22, 19:23, 20:25,
21:3, 23:14, 24:15,
57:11

**shareholders** [3] - 19:2, 53:13, 54:11
**shares** [1] - 35:14
**Shattuck** [11] - 36:6, 45:5, 45:17, 49:14, 50:11, 50:14, 50:24, 58:1, 58:2, 58:18, 58:24
**shed** [1] - 45:1
**shield** [1] - 6:16
**short** [2] - 26:11, 26:17
**shortly** [1] - 20:3
**show** [7] - 6:2, 6:4, 6:10, 6:12, 8:10, 19:6, 55:24
**showing** [1] - 6:19
**shred** [1] - 58:7
**side** [1] - 3:21
**sides** [1] - 3:12
**Siebert** [1] - 1:20
**Siebert-Johnson** [1] - 1:20
**significant** [4] - 18:25, 19:2, 23:16, 48:18
**silent** [1] - 35:14
**similar** [3] - 27:23, 29:16, 41:25
**Simpkins** [2] - 1:25, 61:10
**simply** [10] - 8:1, 19:15, 20:2, 21:1, 21:20, 31:3, 34:12, 37:21, 57:24, 60:3
**single** [1] - 23:5
**situation** [30] - 6:13, 8:8, 8:14, 9:1, 14:22, 15:19, 19:20, 20:6, 21:17, 23:2, 23:4, 23:9, 24:2, 24:5, 24:7, 24:12, 25:4, 25:5, 25:6, 25:8, 26:13, 26:18, 27:4, 41:9, 57:19, 57:21, 58:6, 58:8, 58:9
**situations** [2] - 40:13, 57:20
**six** [2] - 18:14, 41:2
**slightly** [2] - 17:25, 22:7
**slow** [1] - 57:15
**sold** [1] - 35:11
**solution** [1] - 59:10
**someone** [1] - 26:14
**sometime** [1] - 46:23
**somewhat** [2] - 3:18, 5:16
**somewhere** [2] - 27:18, 56:3
**soon** [1] - 60:20

**sorry** [3] - 25:1, 53:20, 55:16
**sort** [6] - 26:13, 30:17, 30:25, 46:24, 53:5, 54:21
**soundness** [1] - 20:1
**Southern** [2] - 29:24, 42:3
**SPD** [7] - 18:1, 18:4, 31:9, 52:13, 52:18, 53:6, 54:3
**SPD's** [1] - 9:17
**speaks** [1] - 7:20
**specific** [6] - 3:16, 4:15, 34:14, 44:17, 47:20, 48:20
**specifically** [1] - 52:3
**specified** [2] - 9:16, 60:6
**specify** [1] - 59:19
**spell** [1] - 31:1
**spend** [1] - 8:22
**spiral** [1] - 23:13
**sponsor** [2] - 31:6, 50:3
**stabilize** [2] - 24:3, 26:9
**stabilized** [2] - 20:7, 21:21, 24:10
**stabilizing** [1] - 25:6
**stage** [3] - 15:25, 28:16, 29:13
**stages** [1] - 29:1
**standard** [4] - 16:5, 16:19, 55:20
**standpoint** [1] - 9:3
**Stanley** [1] - 42:1
**start** [6] - 4:18, 20:11, 20:19, 20:21, 41:7, 46:6
**started** [1] - 21:22
**starting** [1] - 44:20
**state** [1] - 57:3
**statement** [3] - 13:12, 54:7, 55:14
**statements** [5] - 30:11, 44:23, 45:24, 52:8, 52:10
**STATES** [1] - 1:1
**States** [2] - 1:14, 61:6
**statewide** [2] - 27:24, 48:6
**status** [5] - 33:18, 35:6, 35:21, 48:8, 50:3
**statute** [3] - 36:20, 40:12, 42:8
**stay** [2] - 47:18, 56:23
**Stearns** [1] - 22:14
**step** [4] - 5:13, 6:8,

16:20, 23:8
**stepped** [3] - 13:11, 24:18, 24:22
**still** [8] - 19:21, 21:8, 22:1, 42:8, 43:20, 54:3, 56:3, 56:13
**stock** [100] - 3:23, 3:25, 4:3, 5:3, 5:5, 5:9, 5:10, 5:15, 6:4, 6:6, 6:12, 6:18, 7:10, 7:11, 7:14, 7:17, 8:5, 8:12, 9:10, 9:19, 9:21, 10:6, 10:10, 10:25, 11:23, 12:6, 12:9, 12:13, 14:15, 14:23, 15:2, 16:11, 16:12, 16:21, 16:22, 16:25, 17:1, 17:18, 17:20, 17:22, 17:23, 18:3, 18:6, 18:20, 19:9, 19:17, 19:18, 19:21, 20:11, 20:13, 21:1, 21:3, 21:8, 21:16, 21:21, 21:24, 22:6, 22:19, 23:16, 23:24, 24:10, 24:14, 24:22, 24:24, 25:6, 25:15, 25:22, 25:23, 27:3, 27:25, 30:7, 33:20, 35:11, 36:5, 36:9, 37:17, 38:13, 39:8, 39:16, 39:18, 41:10, 41:19, 42:7, 42:24, 43:1, 43:12, 43:16, 43:18, 44:16, 46:2, 46:4, 46:18, 47:21, 48:6, 50:25, 54:10, 59:21
**Stock** [15] - 9:7, 9:16, 9:24, 11:3, 11:12, 11:17, 12:2, 13:6, 13:12, 40:2, 43:19, 43:21, 43:24, 46:4, 54:15
**stock-drop** [1] - 5:3
**stocks** [1] - 5:1
**strategy** [1] - 18:12
**strict** [1] - 27:25
**strong** [2] - 22:1, 35:24
**stronger** [1] - 27:23
**submit** [1] - 21:1
**submitted** [1] - 42:2
**subpart** [1] - 34:7
**subsidiary** [1] - 57:13
**substance** [1] - 31:2
**substantial** [1] - 6:16
**substantiate** [1] - 35:17
**successful** [1] - 19:4

**successor** [1] - 38:9
**sued** [1] - 17:2
**sufficient** [3] - 30:14, 48:1, 48:13
**sufficiently** [1] - 29:14
**suggest** [6] - 12:17, 15:20, 16:22, 17:8, 22:2, 58:3
**suggesting** [3] - 7:8, 43:20, 44:13
**suggests** [3] - 8:16, 10:23, 23:7
**Summary** [6] - 31:9, 31:11, 31:13, 51:25, 52:2, 53:1
**summary** [3] - 28:17, 28:20, 28:21
**summer** [1] - 44:24
**supplemental** [3] - 42:2, 42:10, 42:12
**supplying** [1] - 55:14
**support** [2] - 37:4, 38:15
**supposed** [3] - 20:20, 27:24, 58:21
**switch** [1] - 37:24

## T

**taller** [1] - 34:23
**tank** [1] - 25:15
**Taylor** [1] - 2:2
**term** [1] - 45:23
**termination** [2] - 53:18, 53:23
**terms** [6] - 6:19, 11:21, 16:3, 16:10, 16:19, 41:13
**terrible** [1] - 16:24
**test** [1] - 7:16
**THE** [82] - 1:1, 1:2, 3:2, 3:4, 3:8, 3:11, 4:12, 4:17, 7:4, 7:7, 10:20, 11:6, 11:11, 11:25, 12:7, 12:10, 12:20, 13:4, 13:7, 13:19, 14:8, 16:13, 17:10, 20:11, 26:11, 27:15, 28:17, 28:20, 29:18, 30:2, 31:20, 31:24, 32:2, 34:19, 34:22, 35:19, 36:4, 36:11, 36:14, 36:18, 36:25, 37:5, 37:10, 37:13, 37:18, 38:2, 38:6, 38:24, 39:9, 39:20, 39:24, 40:4, 42:22, 43:3, 43:7, 43:20, 43:25, 44:4,

46:5, 46:10, 47:24, 48:17, 49:25, 52:12, 52:15, 52:19, 52:25, 53:4, 53:20, 53:23, 54:1, 54:6, 54:12, 54:17, 55:16, 56:3, 56:7, 56:20, 56:25, 60:9, 60:12, 60:14
**themselves** [2] - 10:4, 49:18
**theories** [1] - 4:24
**theory** [2] - 18:18, 23:19
**thereafter** [1] - 20:3
**therefore** [2] - 8:17, 14:24
**they've** [1] - 27:6
**thinking** [1] - 46:24
**Third** [1] - 15:25
**third** [2] - 20:17, 38:3
**thoroughness** [1] - 55:10
**three** [7] - 7:1, 7:24, 11:5, 12:12, 13:9, 22:15, 34:8
**threshold** [2] - 14:11, 15:7
**throughout** [1] - 44:24
**timing** [5] - 8:23, 25:18, 45:1, 48:17, 57:2
**today** [4] - 40:1, 54:15, 55:3, 58:3
**tomorrow** [2] - 6:25, 7:1, 26:2
**took** [1] - 13:11
**totally** [2] - 59:4, 59:12
**traded** [1] - 21:3
**trading** [3] - 19:21, 21:8, 46:20
**transaction** [2] - 55:9
**transcript** [1] - 61:2
**trend** [1] - 15:18
**trended** [1] - 22:6
**trending** [3] - 21:24, 22:24, 30:18
**trial** [3] - 16:1, 28:16, 36:3
**trouble** [1] - 25:16
**true** [3] - 13:13, 57:4, 61:7
**Trust** [11] - 36:16, 37:6, 38:4, 38:7, 38:21, 38:23, 38:25, 39:3, 39:10, 39:11, 39:12
**trust** [3] - 36:21, 42:17, 42:18
**trustee** [1] - 40:23
**Trustee** [1] - 37:16

**trustees** [1] - 42:16
**truth** [1] - 24:1
**trying** [4] - 6:22,
17:22, 23:19, 57:7
**turn** [3] - 9:4, 13:24,
43:17
**turning** [3] - 33:12,
43:13, 49:4
**two** [19] - 12:19, 18:1,
22:12, 23:18, 24:3,
30:8, 31:17, 35:16,
38:4, 41:6, 45:4,
47:4, 49:18, 49:21,
49:22, 51:11, 56:15,
57:9, 58:15
**two-year** [1] - 57:9
**types** [2] - 35:16,
40:19

## U

**ultimately** [5] - 8:20,
40:7, 57:14, 58:17
**unable** [1] - 40:2
**unamended** [1] - 38:4
**unavailable** [2] - 59:4,
59:12
**uncertainty** [1] - 23:1
**uncovered** [1] - 57:12
**under** [10] - 15:22,
23:6, 28:3, 32:11,
39:5, 39:14, 49:22,
51:17, 59:22, 60:3
**underlying** [1] - 32:22
**understandable** [1] -
33:19
**unduly** [1] - 18:21
**unfolding** [1] - 8:14
**unilateral** [1] - 5:16
**UNITED** [1] - 1:1
**United** [2] - 1:14, 61:6
**unknowable** [2] -
8:13, 46:24
**unless** [8] - 15:3,
15:14, 19:6, 22:2,
27:12, 29:7, 30:1,
34:17
**unpredictable** [1] -
8:12
**unremarkable** [1] - 9:3
**unsound** [1] - 49:1
**unsustainable** [1] -
46:15
**up** [24] - 7:4, 13:14,
19:19, 20:11, 20:16,
20:22, 21:9, 21:16,
24:6, 24:11, 24:25,
25:1, 25:2, 26:2,
34:3, 34:12, 35:1,

36:15, 38:14, 42:10,
47:14, 50:3, 58:4
**update** [1] - 53:6
**updates** [1] - 53:5

## V

**value** [1] - 57:10
**various** [3] - 28:25,
32:10, 53:17
**vehicle** [2] - 28:5,
40:18
**versus** [2] - 3:6, 4:1
**vesting** [2] - 40:17
**violated** [2] - 43:15,
56:16
**violation** [2] - 33:4,
55:1
**violations** [1] - 57:12
**voluminous** [1] -
56:12
**voluntary** [1] - 9:11
**VS** [1] - 1:6
**vs** [1] - 61:3

## W

**Warren** [1] - 47:10
**ways** [2] - 10:1, 50:4
**week** [7] - 10:1, 17:1,
24:3, 24:16, 24:21,
26:9, 58:10
**weeks** [3] - 45:4, 46:8,
47:5
**whatsoever** [1] -
55:13
**whole** [3] - 27:8,
47:13, 59:6
**wide** [1] - 16:19
**willing** [1] - 55:25
**withdraw** [1] - 54:9
**word** [2] - 10:23,
37:12
**words** [1] - 16:21
**world** [1] - 59:9
**worldwide** [1] - 4:25
**worst** [1] - 24:23
**worth** [1] - 46:21
**written** [2] - 36:21,
53:12

## Y

**year** [3] - 25:2, 53:14,
57:9
**years** [3] - 16:2, 58:6,
58:15
**yell** [1] - 34:22

**York** [2] - 29:24, 42:3

## Z

**zero** [1] - 57:21